******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MICHAEL JONES *v.* DEPARTMENT OF CHILDREN
AND FAMILIES
(AC 37529)

DiPentima, C. J., and Prescott and Gruendel, Js.

*Argued September 19, 2016—officially released April 4, 2017*

(Appeal from Superior Court, judicial district of
Hartford, Scholl, J. [judgment].)

*James V. Sabatini*, for the appellant (plaintiff).

*Josephine S. Graff*, assistant attorney general, with
whom were *Antoria D. Howard*, associate attorney general, and, on the brief, *George Jepsen*, attorney general,
and *Ann E. Lynch*, assistant attorney general, and for
the appellee (defendant).

*Opinion*

GRUENDEL, J. In this employment discrimination case, the plaintiff, Michael Jones, appeals from the trial court's judgment in favor of the defendant, the Department of Children and Families. On appeal, the plaintiff claims that the court improperly concluded that he did not meet his burden of persuasion with respect to his allegations that the defendant subjected him to unlawful discrimination on the basis of his sexual orientation. See Connecticut Fair Employment Practices Act (act), General Statutes § 46a-51 et seq. Specifically, the plaintiff contends that the court: (1) improperly imposed on the plaintiff the burden of proving the falsity of the reason given by the defendant for the termination, (2) improperly applied an adverse inference against the plaintiff (3) failed to correctly apply the "cat's paw" theory of liability, (4) erred by failing to make factual findings regarding discriminatory animus held by the plaintiff's supervisors, and (5) improperly concluded that the plaintiff's retaliation claim relied on timing alone. We disagree with the plaintiff's assertions and affirm the judgment of the trial court.

The following facts and procedural events are relevant to this appeal. The plaintiff, an African-American homosexual male, began his employment as a durational social worker trainee with the defendant on May 25, 2007. On December 26, 2008, the plaintiff filed a claim of employment discrimination against the defendant with the Commission on Human Rights and Opportunities (commission) alleging, in part, the claims set forth in the present case. In December, 2010, following the commission's release of jurisdiction, the plaintiff brought an action in state court alleging employment discrimination in violation of the act. Specifically, the plaintiff claimed that the defendant discriminated against him during his employment because of his sexual orientation, retaliated against him because he submitted a formal complaint about the discriminatory behavior, and subjected him to a hostile work environment.

Following a trial to the court, the court, *Scholl, J.*, made detailed factual findings. Among these were findings that were uncontested in the trial court proceedings and others that were made by the court based on its evaluation of the evidence. The following facts are undisputed. The plaintiff was an employee of the defendant within the meaning of the act. Valeriana DeBrito, who was employed by the defendant as a social work supervisor, supervised the plaintiff for part of the time that he was employed by the defendant. The affirmative action report written by the defendant's internal investigator concluded that DeBrito had engaged in discriminatory behavior toward the plaintiff on the basis of his sexual orientation.

Over the course of the plaintiff's employment with the defendant, he received three formal counseling memos. These memos were not considered a form or act of discipline by the defendant, but were instead used to evaluate the plaintiff's continued employment. On May 19, 2008, the defendant gave the plaintiff an initial probationary performance evaluation, which rated the plaintiff's overall performance as "fair," partly on the basis of poor ratings in the categories of human relations and judgment. On or about October 3, 2008, the plaintiff e-mailed the defendant's human resources director to notify the defendant of discriminatory and harassing conduct that had been directed toward him. Subsequently, in a nine month evaluation dated October 16, 2008, the plaintiff received an overall job performance rating of "unsatisfactory." The plaintiff was terminated from the defendant's employ on October 22, 2008, prior to the expiration of his probationary work period. On December 26, 2008, the plaintiff filed a complaint with the commission. The commission issued the plaintiff a release of jurisdiction letter dated October 25, 2010.

The court made the following additional factual findings. DeBrito was the plaintiff's immediate supervisor from May, 2007, until April, 2008. At the beginning of the plaintiff's employment, the plaintiff and DeBrito were friendly, but DeBrito mimicked the plaintiff on occasion. DeBrito completed a durational performance assessment of the plaintiff, dated September 25, 2007, covering the period from May 25, 2007, until September 25, 2007, which could be characterized as generally favorable to the plaintiff.

On October 25, 2007, DeBrito and her supervisor, Robert Lapadula, met with the plaintiff and addressed with him their concerns about his disrupting the work place by being overly social. On December 7, 2007, the plaintiff was appointed to a permanent social worker position, to be effective on December 28, 2007, subject to a ten month probationary period[1] that was to expire on October 27, 2008. A probationary period is a preliminary period of employment used to determine whether the employee is well suited for the position for which he was hired and whether the employee should be retained on a permanent basis. The defendant is not required to use progressive discipline for a probationary employee.

On December 21, 2007, DeBrito issued a formal counseling memorandum to the plaintiff regarding a failure to follow directives. Three incidents were cited in the memo. The first two incidents involved the plaintiff's directing new trainees to supervise visits with families without approval from DeBrito. The third incident involved the plaintiff's conducting a supervised home visit that exposed the children to safety risks without approval from DeBrito and in disregard of her directives. The memo indicated that DeBrito had addressed

these issues with the plaintiff on several occasions and that they had both met with Lapadula on October 25, 2007, regarding these and other performance issues. Although the memo was not considered formal disciplinary action, it noted that the "failure to make and sustain significant improvements in the area[s] listed above may result in [the plaintiff] being dropped during [his] [probationary] period."

On January 24, 2008, the plaintiff was issued a second counseling memo by DeBrito regarding his failure to follow directives. This memo cited an incident from December, 2007, during which the plaintiff had submitted plans to a family for review that were different from the plans DeBrito had approved. The memo once again noted that a failure to improve could result in the plaintiff's termination during his probationary period. At the time that this counseling memo was issued, Michael Wood, the principal human resources specialist for the defendant, suggested to DeBrito and Lapadula that "strong indicators are being given that [the plaintiff] may not be a good match for the agency." He noted that this was "the second formal counseling matter for this [probationary] employee that has demonstrated behavior of not being able to follow instructions." On February 20, 2008, the plaintiff received a third counseling memo from DeBrito regarding his failure to follow directives. The memo cited an instance in which the plaintiff conducted the defendant's business when its office was closed, and had entered false information into the defendant's system.

On May 19, 2008, DeBrito completed an employee service rating for the plaintiff for the first four months of his probationary period from December 28, 2007 to April 28, 2008. The plaintiff was evaluated overall as "fair," a rating that is below satisfactory. The evaluation indicated that this rating was based on claims that the plaintiff was "difficult, pushy and demanding" with service providers and clients, and that he had shown resistance to supervision. The evaluation also indicated that the plaintiff needed to demonstrate improvement in judgment because he had conducted a supervised visit in a home when he was told by his supervisor not to do so, and had conducted state business on a holiday, without prior approval or supervision, by meeting with a family in the defendant's parking lot. On or about October 3, 2008, the plaintiff filed an internal discrimination complaint with the defendant's director of human resources in which he claimed discrimination, alleging that his rights as a black gay man had been "trampled upon."

In an evaluation dated October 16, 2008, which covered the period from April 28, 2008 to October, 2008, the plaintiff's new supervisor, Dana Goldberg,[2] rated the plaintiff's overall performance as "unsatisfactory." At the time she prepared this evaluation, Goldberg was

unaware of the plaintiff's October 3, 2008 complaint. Goldberg's evaluation was based on unsatisfactory ratings in the categories of human relations and judgment. As to human relations, the evaluation noted that since May, 2008, the defendant had received several complaints about the plaintiff, including one complaint that he had left children alone during a supervised visit and another that he allowed the noncustodial biological father to learn the previously undisclosed location of his children's residence. The plaintiff already had admitted to the veracity of some of these complaints at the time Goldberg issued her evaluation. In regard to judgment, the evaluation also cited the fact that the plaintiff had made inappropriate comments about the defendant's staff to a client and another staff member.

On October 22, 2008, Wood told the plaintiff he was being terminated from employment. The defendant's internal investigation of the plaintiff's October 3, 2008 complaint did not begin until after the decision to terminate the plaintiff had been made. The letter of termination cited the fact that during the plaintiff's probationary period, he had "regressed in the areas of ability to learn new duties, dependability, human relations, and judgment . . . ." DeBrito and Goldberg were not involved in the decision to terminate the plaintiff's employ, but their evaluations of his performance were considered by the defendant's human resources department, the ultimate decision-maker regarding the plaintiff's termination.

The defendant's internal investigation into the plaintiff's October 3, 2008 discrimination complaint was concluded on December 11, 2008. The report by the investigator found that there was sufficient evidence to believe that DeBrito had engaged in discriminatory behavior based on the plaintiff's sexual orientation. The report concluded, however, that the defendant had a legitimate reason to terminate the plaintiff during his probationary period due to his poor judgment and poor human relations skills. The defendant issued DeBrito a formal counseling memo as a result of the investigation.

In a subsequent grievance hearing, an arbitrator found that there was enough evidence to establish that two of the plaintiff's supervisors had acted in a manner at least appearing to be discriminatory with respect to the plaintiff's sexual orientation. The arbitrator concluded, however, that the record lacked any clear evidence of a nexus between any intentional discriminatory supervision of the plaintiff and his loss of employment, and that there was ample evidence that the plaintiff's performance issues could have supported a termination during his probationary period.

After exhausting the defendant's internal procedures for review of his termination, the plaintiff commenced the present action claiming that he was discriminatorily terminated on the basis of his sexual orientation and

his race. Following a trial, the court issued a comprehensive memorandum of decision on December 12, 2014. The court concluded that the plaintiff failed to demonstrate that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. Further, the court determined that even if the plaintiff had established an inference of discrimination, he had failed to refute the defendant's legitimate nondiscriminatory reason for terminating his employment under the burden shifting analysis set forth in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). For those reasons, the court rendered judgment in favor of the defendant. This appeal followed. Additional facts will be set forth as necessary.

I

We first address the plaintiff's claim that the court applied an incorrect standard when it found that the plaintiff failed to prove that the defendant discriminated against him on the basis of his sexual orientation. Specifically, the plaintiff argues that the court "conflated" the two different analyses used to review a discrimination claim, and thereby incorrectly imposed on the plaintiff the burden of proving *both* the falsity of the defendant's reasons for terminating his employment, as well as the fact that the plaintiff's sexual orientation was a motivating factor in the termination decision. We do not agree that the court applied an incorrect standard.

Connecticut statutorily prohibits discrimination in employment based on an individual's sexual orientation.[3] See General Statutes § 46a-81c. Our courts have looked to federal law for guidance in enforcing our own antidiscrimination statutes, and recognize two methods of analysis for claims of disparate treatment.[4] See *Levy* v. *Commission on Human Rights & Opportunities*, 236 Conn. 96, 103, 671 A.2d 349 (1996). Those two methods are (1) the mixed-motive/*Price Waterhouse* model; *Price Waterhouse* v. *Hopkins*, 490 U.S. 228, 246, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989); and (2) the pretext/ *McDonnell Douglas-Burdine* model. *Texas Dept. of Community Affairs* v. *Burdine*, 450 U.S. 248, 252–56, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); *McDonnell Douglas Corp.* v. *Green*, supra, 411 U.S. 802; see also *Levy* v. *Commission on Human Rights & Opportunities*, supra, 104–109.

The mixed-motive/*Price Waterhouse* analysis applies to cases where "an employment decision is motivated by both legitimate and illegitimate reasons. See *Price Waterhouse* v. *Hopkins*, supra, 490 U.S. 228 . . . . In such instances, a plaintiff must demonstrate that the employer's decision was motivated by one or more prohibited statutory factors. Whether through direct evidence or circumstantial evidence, a plaintiff must submit enough evidence that, if believed, could reason-

ably allow a [fact finder] to conclude that the adverse employment consequences resulted because of an impermissible factor. . . .

"Under this model, the plaintiff's prima facie case requires that the plaintiff prove by a preponderance of the evidence that he or she is within a protected class and that an impermissible factor played a motivating or substantial role in the employment decision. . . . Once the plaintiff has established his prima facie case, the burden of production and persuasion shifts to the defendant. [T]he defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken [the impermissible factor] into account." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *Levy* v. *Commission on Human Rights & Opportunities*, supra, 236 Conn. 105–106.

If a plaintiff cannot prove directly the reasons that motivated an employment decision, the plaintiff may establish a prima facie case under the *McDonnell Douglas-Burdine* or "pretext" model of analysis. Id., 107. "[T]o establish a prima facie case of discrimination . . . the complainant must demonstrate that (1) he is in the protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) that the adverse action occurred under circumstances giving rise to an inference of discrimination. . . . The level of proof required to establish a prima facie case is minimal and need not reach the level required to support a jury verdict in the plaintiff's favor." (Internal quotation marks omitted.) *Tomick* v. *United Parcel Service, Inc.*, 157 Conn. App. 312, 326–27, 115 A.3d 1143, cert. granted, 317 Conn. 916, 117 A.3d 854 (2015).

"Under the *McDonnell Douglas-Burdine* model, the burden of persuasion remains with the plaintiff. . . . Once the plaintiff establishes a prima facie case, however, the burden of production shifts to the defendant to rebut the presumption of discrimination by articulating (not proving) some legitimate, nondiscriminatory reason for the plaintiff's rejection. . . . Because the plaintiff's initial prima facie case does not require proof of discriminatory intent, the *McDonnell Douglas-Burdine* model does not shift the burden of persuasion to the defendant. Therefore, [t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. . . . It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. . . . Once the defendant offers a legitimate, nondiscriminatory reason, the plaintiff then has an opportunity to prove by a preponderance of the evidence that the proffered reason is pretextual. . . .

"The *McDonnell Douglas-Burdine* analysis keeps the doors of the courts open for persons who are unable initially to establish a discriminatory motive. If a plain-

tiff, however, establishes a *Price Waterhouse* prima facie case, thereby proving that an impermissible reason motivated a defendant's employment decision, then the *McDonnell Douglas-Burdine* model does not apply, and the plaintiff should receive the benefit of the defendant bearing the burden of persuasion." (Citations omitted; internal quotation marks omitted.) *Levy* v. *Commission on Human Rights & Opportunities*, supra, 236 Conn. 108–109.

In the present case, the plaintiff argues that the court incorrectly "conflated the two distinct ways for a plaintiff to prevail" and improperly imposed the ultimate burden of persuasion on the plaintiff. The plaintiff cites to *Jacobs* v. *General Electric Co.*, 275 Conn. 395, 403, 880 A.2d 151 (2005), for the proposition that a plaintiff cannot be required to prove both that the defendant's proffered nondiscriminatory reason was pretextual and that a discriminatory reason motivated the defendant's adverse employment action. However, the plaintiff misreads the *Jacobs* case, and, further, the trial court analyzed the plaintiff's claims under both the *Price Waterhouse* and the *McDonnell Douglas-Burdine* models and found that the claims failed under *either* analysis.

In *Jacobs*, our Supreme Court held that a court may not give jury instructions that improperly impose on the plaintiff the burden of showing the falsity of the defendant's proffered explanation for the adverse employment action. *Jacobs* v. *General Electric Co.*, supra, 275 Conn. 403. The court also held that a proper jury charge must inform the jury that there are two different means by which a plaintiff may establish a claim of intentional discrimination: "the first by direct proof of a discriminatory motive and the second, indirect method by proving that the reasons given by the employer for the employment decision were pretextual." Id.

In the present case, because the court performed an analysis under each of the distinct methods, the trial court's decision was consistent with *Jacobs*. Unlike in *Jacobs*, the court here, in its burden-shifting analysis, did address each method by which the plaintiff could prevail. The court first analyzed the plaintiff's claims under the *McDonnell Douglas-Burdine* burden-shifting analysis, and found that the plaintiff failed to meet his burden of proving that his employment termination was caused by unlawful discrimination by the defendant. The court then applied the mixed-motive/*Price Waterhouse* analysis and found that the defendant had established by a preponderance of the evidence that it had a legitimate reason to terminate the plaintiff. Because the court fully analyzed the plaintiff's discrimination claim under both of the recognized analytical methods, the court's decision was proper. Accordingly, the plaintiff's claim is without merit.

## II

The plaintiff also claims that the trial court incorrectly applied an adverse inference against him for his failure to call Lapadula as a witness at trial. General Statutes § 52-216c prohibits a fact finder from drawing an adverse inference on the basis of a party's failure to call a witness unless the party satisfies certain criteria. It provides, in relevant part: "No court in the trial of a civil action may instruct to the jury that an inference unfavorable to any party's cause may be drawn from the failure of any party to call a witness at such trial. However, counsel for any party to the action shall be entitled to argue to the trier of fact during closing arguments . . . that [it] should draw an adverse inference from another party's failure to call a witness who has been proven to be available to testify." General Statutes § 52-216c. The plaintiff argues that the trial court applied an adverse inference against him for his failure to call Lapadula as a witness, and that this was done without a showing that Lapadula was available to testify. We do not agree that an adverse inference was used by the trial court in making its factual findings.

In discussing the plaintiff's claim that his supervisor DeBrito harbored discriminatory animus toward him, the trial court stated: "The plaintiff makes much of conversations between DeBrito and Lapadula regarding the plaintiff in which the plaintiff claims Lapadula described DeBrito's perception of the plaintiff as too gay and flamboyant and that it affected her evaluation of his job performance. Yet Lapadula did not testify at trial and DeBrito denied the statements [Lapadula] made to [the defendant's] investigator. Therefore the court finds that there was insufficient evidence to establish that in fact DeBrito held these beliefs." The trial court's reference to Lapadula was in regard to DeBrito's credibility. The plaintiff had asked the court to make a finding that DeBrito acted with discriminatory animus, based in part on Lapadula's out-of-court statements about what DeBrito had said about the plaintiff. In weighing the evidence, the court noted that DeBrito denied making the statements, and that Lapadula did not testify about them. The court was simply assessing credibility, and no inference was drawn from the fact that Lapadula did not testify. Accordingly, the trial court did not draw an adverse inference from the plaintiff's failure to produce Lapadula as a witness, and the plaintiff's claim fails.

## III

The plaintiff next claims that the trial court erred in concluding that the "cat's paw" theory of liability did not apply to the present case. He argues that the facts of this case support the cat's paw theory of liability. Specifically, the plaintiff claims that under the cat's paw theory of liability, the defendant is responsible for

intentional discrimination if its decision to terminate his employment was tainted by the impermissible bias of DeBrito. We agree with the trial court that the cat's paw theory does not apply.

"[S]o-called mixed questions of fact and law, which require the application of a legal standard to the historical-fact determinations, are not facts in this sense. . . . [Such questions require] plenary review by this court unfettered by the clearly erroneous standard. . . . When legal conclusions of the trial court are challenged on appeal, we must decide whether [those] . . . conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *D'Appollonio* v. *Griffo-Brandao*, 138 Conn. App. 304, 323–24, 53 A.3d 1013 (2012).

"The cat's paw theory of liability has been the subject of a recent [United States] Supreme Court decision which involved employment discrimination under the Uniformed Services and Reemployment Rights Act (USERRA). *Staub* v. *Proctor Hosp.*, [562 U.S. 411], 131 S. Ct. 1186, 179 L. Ed. 2d 144 (2011). In *Staub*, the Supreme Court considered the circumstances under which an employer may be held liable for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision. . . . In a cat's paw case, a plaintiff typically seeks to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision. The Supreme Court held that a plaintiff may establish cat's paw liability under USERRA if a supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA. . . . The Supreme Court explained that [p]roximate cause requires only some direct relation between the injury asserted and the injurious conduct alleged, and excludes only those link[s] that are too remote, purely contingent, or indirect. . . .

"The Supreme Court explained that if the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action then the employer will not be liable. . . . However, the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified. . . . The Supreme Court further explained that its holding, contrary to the dissent's characterization, reflected the longstanding principle that an employer should only be liable when it had delegated part of the decision making power to the biased supervisor. . . . The Supreme Court reasoned that if the independent

investigation relies on facts provided by the biased supervisor—as is necessary in any case of cat's-paw liability—then the employer (either directly or through the ultimate decision maker) will have effectively delegated the fact finding portion of the investigation to the biased supervisor." (Citations omitted; internal quotation marks omitted.) *Rajaravivarma v. Board of Trustees for Connecticut State University System*, 862 F. Supp. 2d 127, 148–49 (D. Conn. 2012).

Prior to the United States Supreme Court's decision in *Staub*, this court embraced a transferred intent theory that was loosely analogous to the cat's paw theory of liability articulated in *Staub*. In *United Technologies Corp.* v. *Commission on Human Rights & Opportunities*, 72 Conn. App. 212, 234–35, 804 A.2d 1033, cert. denied, 262 Conn. 920, 812 A.2d 863 (2002), this court stated: "Our law allows for the transfer of intent to discriminate . . . . It is true that [w]ithout some proof of an improper motive, [a plaintiff's] case must fail. . . . Nevertheless, companies may be held liable for discrimination even where the decision-making official did not intentionally discriminate if the information used by that official in deciding to terminate a worker's employment was filtered through another employee who had a discriminatory motive. See *Jiles* v. *Ingram*, 944 F.2d 409, 413–14 (8th Cir. 1991) (discriminatory intent of employer's agents sufficient proof to hold employer responsible for discriminatory termination without intentional discrimination by final decision maker); see also *Kientzy* v. *McDonnell Douglas Corp.*, 990 F.2d 1051, 1057 (8th Cir. 1993) (when a committee has acted as the conduit of [a supervisor's] prejudice— his cat's paw—the innocence of its members would not spare the company from liability)." (Citation omitted; internal quotation marks omitted.)

In the present case, the court did not err in concluding that the cat's paw theory of liability did not apply. After weighing and assessing all of the evidence, the court concluded that, regardless of whether any discriminatory conduct occurred prior to the plaintiff's termination, the ultimate decision to terminate the plaintiff was made through an independent review of the plaintiff's job performance. The court agreed with the conclusions drawn by Wood, the defendant's internal investigation, and the arbitrator that "there were significant lapses in the plaintiff's judgment warranting his drop during the working test period." Because the final termination decision was made after an independent review of the plaintiff's performance based on concrete, objective factors, the court correctly concluded that the cat's paw theory of liability did not apply to this case.

IV

Next, we assess the plaintiff's claims that the court erred by failing to make factual findings in regard to discriminatory animus harbored by the plaintiff's super-

visors, DeBrito and Goldberg. "Questions of fact are subject to the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence . . . we give great deference to its findings." (Internal quotation marks omitted.) *Reiner, Reiner & Bendett, P.C.* v. *Cadle Co.*, 278 Conn. 92, 107, 897 A.2d 58 (2006).

A

The plaintiff first argues that the trial court should have found that DeBrito held a discriminatory animus toward him, and that this discriminatory animus was direct evidence of the defendant's discrimination. In support of his argument, the plaintiff points to evidence in the record that he believes establishes that DeBrito held a discriminatory animus toward him, as well as the fact that the defendant admitted to this. Specifically, the plaintiff cites to the defendant's internal investigation, which was introduced into evidence at the trial, as well as the testimony of Terry Lynn Johnston, the defendant's investigator who investigated the plaintiff's claims of discrimination. Though this evidence may have supported the plaintiff's claim that DeBrito held a discriminatory animus toward him, the court was entitled to weigh this supporting evidence with all of the other evidence before arriving at its factual determination.

According to the notes from the internal investigation that were entered into the record at trial, the defendant's investigator was told by Lapadula that DeBrito had told the plaintiff "why can't you be a gay man like Bob Lapadula." The notes also indicate that Lapadula told the investigator that DeBrito had come to him and stated that the plaintiff is "flamboyant" and that she thought that the plaintiff became "more gay" when he went from a durational position to a regular probationary position. At trial, DeBrito denied making these statements. The plaintiff also cites to Johnston's testimony as evidence establishing that DeBrito held a discriminatory animus toward him. Johnston, however, testified only that Lapadula had reported to her that DeBrito had said that the plaintiff was "too gay." Johnston did not testify as to her own personal knowledge of whether DeBrito spoke these words, and Johnston denied that DeBrito's perception of the plaintiff interfered with her evaluation of the plaintiff regarding his judgment and ability to get along with others.

Although there was conflicting evidence regarding DeBrito's statements about the plaintiff, the record reflects that the trial court made a credibility determination by crediting DeBrito's testimony over the hearsay

statements from the investigator's notes. "Where there is conflicting evidence . . . we do not retry the facts or pass upon the credibility of the witnesses. . . . The probative force of conflicting evidence is for the trier to determine. . . . It is well established that a reviewing court is not in the position to make credibility determinations. . . . This court does not retry the case or evaluate the credibility of the witnesses. . . . Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *Eaddy* v. *Bridgeport*, 156 Conn. App. 597, 606–607, 112 A.3d 230, cert. denied, 317 Conn. 906, 114 A.3d 1220 (2015). As such, the trial court's finding that there was insufficient evidence to establish that DeBrito held a discriminatory animus against the plaintiff is not clearly erroneous.

### B

The plaintiff also argues that the court erred in failing to make any factual findings in regard to the plaintiff's other supervisor, Goldberg, and any discriminatory animus held by her toward the plaintiff. The court, however, did make factual findings about Goldberg, as outlined herein. Accordingly, we do not agree with the plaintiff's assertions.

Among other factual findings, the court found that Goldberg was the plaintiff's supervisor from April, 2008, until the plaintiff's termination from employment. The court also found that on October 16, 2008, Goldberg issued the plaintiff an evaluation that rated the plaintiff's overall performance as "unsatisfactory." This evaluation was based on outside complaints about the plaintiff involving his having left children alone during a supervised visit and his having disclosed the children's residence to their biological father. The plaintiff believes that this evaluation was based solely on discriminatory animus toward him, and the plaintiff points to testimony from other coworkers who alleged that Goldberg may have treated the plaintiff differently. The court, however, neither found that Goldberg harbored discriminatory animus toward the plaintiff, nor did it find that her evaluation was the result of such discriminatory animus. The court's findings are not clearly erroneous because the record supports an inference that the court implicitly found contrarily to the plaintiff's contentions. The record shows that Goldberg based her evaluation on objective factors involving incidents during which the plaintiff put the safety of children at risk. Because there is evidence in the record to show that Goldberg's evaluations were based on objective factors, the trial court's finding that there was no intentional discrimination is not clearly erroneous.

### V

Finally, the plaintiff challenges the court's finding

that he failed to establish causation with regard to his retaliation claim. Specifically, the plaintiff contends that the court found his retaliation claim to rely solely on timing to prove the element of causation, and that the court ignored other forms of substantive proof put forth by the plaintiff. Although the plaintiff argues that the standard of review for this issue is plenary, this court has held that "the question of causation in a prima facie case of retaliation brought under the act is factual in nature and thereby subject to the clearly erroneous standard of review." *Ayantola* v. *Board of Trustees of Technical Colleges*, 116 Conn. App. 531, 538, 976 A.2d 784 (2009).

In order for a plaintiff to prevail on a claim of retaliation under General Statutes 46a-60 (a) (4), he must initially establish a prima facie case by showing that (1) he participated in a protected activity, (2) the defendant knew of the protected activity, (3) he was subject to an adverse employment action, and (4) there was a causal connection between his protected activity and the adverse action. Id., 536. "The causation element can be proven (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant. . . . Alternatively, causation may be satisfied by showing a sufficiently close temporal connection between the protected activity and the adverse action . . . ." (Citation omitted; internal quotation marks omitted.) *Cortez* v. *Dept. of Transportation*, 606 F. Supp. 2d 246, 251 (D. Conn. 2009). "The trier of fact, using the evidence at its disposal and considering the unique circumstances of each case, is in the best position to make an individualized determination of whether the temporal relationship between an employee's protected activity and an adverse action is causally significant. Likewise, the trier of fact is in the best position to determine whether the employer acted with a retaliatory animus." *Ayantola* v. *Board of Trustees of Technical Colleges*, supra, 116 Conn. App. 539–40.

Under the clearly erroneous standard of review, a finding of fact must stand if, on the basis of the evidence before the court and the reasonable inferences to be drawn from that evidence, a trier of fact reasonably could have found as it did. See *Tragakiss* v. *Dowling*, 183 Conn. 72, 73, 438 A.2d 818 (1981). A finding is clearly erroneous when there is no evidence in the record to support it or when, although there is evidence in the record to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Brittell* v. *Dept. of Correction*, 247 Conn. 148, 165, 717 A.2d 1254 (1998).

The court found that "the plaintiff did not prove the

causation element of his [retaliation] claim" because "[a]lthough the plaintiff was notified that his employment was terminated on October 22, 2008, which is close in time to the date of his complaint,[5] a review of the complaint itself reveals that the plaintiff knew, at that time, that his termination was already being considered." The court went on to consider the plaintiff's own statement from his October 3, 2008 complaint in which he wrote: "If the department wants to discuss termination of my tenure as a social worker in the New Britain area office I would be happy to discuss the issue with you."

The plaintiff argues that the court's analysis ignored evidence of factors other than timing put forth by him to prove the element of causation. In particular, the plaintiff argues that the court failed to consider evidence of disparate treatment regarding the defendant's treatment of other coworkers. The plaintiff's argument, however, is based on a misunderstanding of the court's findings. First, the court has the authority as factfinder to discredit any evidence the court deems to be incredible or unworthy of belief. Thus, the court was not required to credit the evidence of disparate treatment put forth by the plaintiff.

"[I]t is well established that a reviewing court is not in the position to make credibility determinations. . . . This court does not retry the case or evaluate the credibility of the [evidence]. . . . Rather, we must defer to the [trier of fact's] assessment of the credibility of the [evidence] . . . ." (Internal quotation marks omitted.) *Smith* v. *Commissioner of Correction*, 121 Conn. App. 85, 92, 994 A.2d 317, cert. denied, 297 Conn. 921, 996 A.2d 1193 (2010). Second, and more importantly, the evidence that was credited by the court to arrive at its finding that the plaintiff failed to prove causation is highly persuasive. Even if the court had credited the evidence of disparate treatment, the statement by the plaintiff in his October 3, 2008 complaint regarding his termination all but disproves his entire claim of retaliation. Our review of the record has not left us with a definite and firm conviction that a mistake has been committed, as the court reasonably could have concluded that the plaintiff had not proven the causation element of his retaliation claim. Accordingly, the court's findings were not clearly erroneous, and the plaintiff's claim fails.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The trial court and the parties have also referred to the probationary period as a "working test period." Although we do not dismiss their terminology, for purposes of clarity, we will refer to this period as "probationary."

[2] DeBrito was no longer the plaintiff's supervisor as of late April, 2008.

[3] General Statutes § 46a-81c (1) provides in relevant part: "It shall be a discriminatory practice in violation of this section: (1) For an employer, by himself or his agent, except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against him in compensation

or in terms, conditions or privileges of employment because the individual's sexual orientation or civil union status . . . ."

[4] " 'Disparate treatment' simply refers to those cases where certain individuals are treated differently than others." *Levy* v. *Commission on Human Rights & Opportunities*, 236 Conn. 96, 104, 671 A.2d 349 (1996).

[5] The plaintiff's discrimination complaint was filed internally with the defendant on October 3, 2008.