******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

ISMAEL AGOSTO *v.* PREMIER
MAINTENANCE, INC.
(AC 40184)

Lavine, Alvord and Pellegrino, Js.

*Syllabus*

The plaintiff sought to recover damages from the defendant company for, inter alia, religious discrimination in violation of the Connecticut Fair Employment Practices Act (§ 46a-51 et seq.) following the termination of his employment. M, who served as the chaplain at a certain church, recommended the plaintiff, who served as the pastor at the same church, to C, who was M's supervisor, to fill a vacant cleaner/porter position at certain apartments that were managed by the defendant's customer, W Co. C, who knew that the plaintiff was a pastor, hired the plaintiff as part of the defendant's cleaning crew. Subsequently, C learned that M, as the cleaning crew's supervisor, would assign the plaintiff less demanding tasks than to other members of the crew and would permit the plaintiff to take frequent breaks from work to talk with the tenants of the apartments about, inter alia, God, religion and church. C gave M a warning about his performance as a supervisor, instructed the plaintiff to focus on work and to minimize his interaction with tenants during work hours, and issued a written warning to the plaintiff, which the plaintiff refused to sign or to respond to with comments. Thereafter, C complied with a request from H, who was employed by W Co. as the manager of the apartments, to terminate the plaintiff and M from their respective positions. The plaintiff's notice to the defendant regarding his unemployment compensation claim acknowledged that he was discharged for spending too much time talking with tenants. The trial court rendered summary judgment in favor of the defendant, concluding, inter alia, that the plaintiff had failed to establish a prima facie case of employment discrimination or retaliation, from which the plaintiff appealed to this court. *Held*:

1. The plaintiff could not prevail on his claim that the trial court improperly concluded that the pretext model of employment discrimination analysis under *McDonnell Douglas Corp.* v. *Green* (411 U.S. 792) and *Texas Dept. of Community Affairs* v. *Burdine* (450 U.S. 248) applied to its adjudication of the defendant's motion for summary judgment, rather than the mixed-motive model of employment discrimination analysis under *Price Waterhouse* v. *Hopkins* (490 U.S. 228); the plaintiff did not allege or present facts that he was terminated from his employment for both legitimate and illegitimate reasons but, instead, claimed that the reason for his employment termination offered by the defendant, namely, his excessive socialization with tenants of the apartments, was a pretext for illegal religious discrimination, and, therefore, the pretext model of analysis applied.

2. The trial court properly determined that there were no genuine issues of material fact as to whether the circumstances under which the plaintiff was discharged from employment gave rise to a prima facie inference of discrimination; although H, who was employed by W Co. and not by the defendant, warned the plaintiff about using certain religious terms when engaging tenants in conversation, remarks made by someone other than the person who discharged the plaintiff may have little tendency to show that the decision maker was motivated by the discriminatory sentiment expressed in the remark, the written warning the plaintiff received from C contained no references to religion or church, C did not speak of the plaintiff's protected group in ethnically or religiously degrading terms, the plaintiff failed to present any evidence that the defendant treated other employees more favorably than it treated him, as M gave the plaintiff preferential treatment, and the uncontested evidence presented by the defendant demonstrated that the plaintiff's discharge was not related to his religion but was, instead, the result of the plaintiff's failure to comply with the defendant's nondiscriminatory policy of limiting the plaintiff's interaction with tenants during work hours and W Co.'s request that the plaintiff not work at any of the properties that it

managed because it was dissatisfied with his performance.

3. The trial court properly rendered summary judgment on the plaintiff's retaliation claim; the plaintiff's allegations and the facts of the present case did not constitute a protected activity, as the record contained no facts presented by the plaintiff that his continued reference to himself as the pastor or his continued reference to M as the chaplain, in contravention of the defendant's instructions that he not do so, was an informal means of complaint, and the plaintiff's refusal to sign his warning notice was also not an informal protest given that his failure to document his protest in the employee's remarks section indicated his agreement with the report as stated.

Argued April 17—officially released October 23, 2018

*Procedural History*

Action to recover damages for, inter alia, alleged religious discrimination, and for other relief, brought to the Superior Court in the judicial district of Waterbury, where the court, *Brazzel-Massaro, J.*, granted the defendant's motion for summary judgment and rendered judgment thereon, from which the plaintiff appealed to this court. *Affirmed*.

*James F. Sullivan*, with whom was *Jake A. Albert*, for the appellant (plaintiff).

*Angelica M. Wilson*, with whom, on the brief, was *Glenn A. Duhl*, for the appellee (defendant).

*Opinion*

PELLEGRINO, J. The plaintiff, Ismael Agosto, appeals from the summary judgment rendered by the trial court in favor of the defendant, Premier Maintenance, Inc., on all counts of the second revised complaint in which the plaintiff alleged religious discrimination in violation of the Connecticut Fair Employment Practices Act (act), General Statutes § 46a-51 et seq. On appeal, the plaintiff claims that the trial court improperly (1) utilized the pretext/*McDonnell Douglas-Burdine* model; *Texas Dept. of Community Affairs* v. *Burdine*, 450 U.S. 248, 252–56, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); rather than the mixed-motive/*Price Waterhouse* model of analysis; *Price Waterhouse* v. *Hopkins*, 490 U.S. 228, 246, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989);[1] when adjudicating the defendant's motion for summary judgment, (2) improperly concluded that there were no genuine issues of material fact as to the circumstances under which he was discharged from employment that give rise to a prima facie inference of religious discrimination and (3) improperly concluded that there were no genuine issues of material fact that he was not engaged in a protected activity that gave rise to a claim of retaliatory discharge. We disagree, and thus affirm the judgment of the trial court.

The plaintiff commenced the present action in November, 2013. He alleged three counts against the defendant: employment discrimination in violation of General Statutes (Rev. to 2011) § 46a-60 (a) (1);[2] discriminatory retaliation in violation of § 46a-60 (a) (4); and aiding and abetting discrimination in violation of § 46a-60 (a) (5). The plaintiff alleged that the defendant employed him to be a cleaner/porter at the Enterprise-Schoolhouse Apartments (apartments) in Waterbury from March 13, 2012, until August 3, 2012. The apartments were managed by WinnResidential, a client of the defendant. Sandino Cifuentes was the plaintiff's supervisor.

The plaintiff alleged that he was the pastor of Tabernacle of Reunion Church (church). Cifuentes knew that he was the pastor of the church. The plaintiff alleged that he was part of a cleaning crew that was led by Luis Martinez, who was the chaplain at the church, and that Cifuentes had informed Martinez that while he was working, Martinez should not refer to the plaintiff as "pastor" or give him the respect ordinarily afforded a pastor. While he was at work, the plaintiff frequently greeted tenants by stating "God bless," but in giving such greetings, he was never delayed for more than a minute or two. On June 14, 2012, Cifuentes warned the plaintiff about interacting with tenants of the apartments.

On or about June 22, 2012, Carolyn Hagan, the manager of the apartments, e-mailed Cifuentes, relaying information she had received from Daisy Alejandro, assistant manager of the apartments. Tenants Enrique Cintron and his wife, Jorge Cintron, had informed Alejandro that, during a church service, the plaintiff had read the names of tenants who were in jeopardy of being evicted. The plaintiff alleged that the Cintrons had lodged the complaint against him in retaliation for his having corrected them for inappropriately playing music in the church. He also alleged that at no time had he read the names of tenants who were in danger of being evicted.

The plaintiff further alleged that on or about June 26, 2012, Hagan requested that Cifuentes remove the plaintiff from his position. Cifuentes discharged the plaintiff from the defendant's employ on August 3, 2012, for the reasons that the plaintiff spent too much time talking to the tenants and Hagan's accusation that the plaintiff had read the names of tenants in jeopardy of eviction from the apartments. Also, the plaintiff alleged that Wendy Smart, a representative of the defendant, signed a statement stating that the plaintiff "[o]verstepped the boundaries of church and work."[3] (Internal quotation marks omitted.)

In count one, the plaintiff claimed that, through its agents, the defendant had violated the act by interfering with his privilege of employment on the basis of his religion. The defendant exhibited ill will, malice, improper motive, and indifference to his religion. In count two, the plaintiff alleged that he held a bona fide religious belief and that the defendant's agents were aware that the plaintiff was the pastor and Martinez was the chaplain of the church. The defendant's agents retaliated against him for practicing his religious beliefs and customs by using the terms "pastor" and "chaplain." In count three, the plaintiff alleged that the defendant aided and abetted the unlawful conduct of its agents, who discriminated against him on the basis of his religious beliefs.

On March 30, 2015, the defendant filed an answer in which it denied the material allegations of the complaint and alleged nine special defenses. The fourth special defense to all counts of the complaint alleged: "All actions taken by [the defendant] with respect to [the] [p]laintiff and [the] [p]laintiff's employment were undertaken for legitimate, nondiscriminatory business reasons." The plaintiff filed a general denial of the defendant's special defenses.

The defendant filed a motion for summary judgment on July 8, 2016. The defendant claimed that the plaintiff could not establish a prima facie case of employment discrimination and retaliation under the act. Even if the plaintiff were able to establish a prima facie case of

employment discrimination and retaliation, those claims would fail because the defendant had a legitimate, nondiscriminatory, nonretaliatory basis for terminating the plaintiff's employment, and the plaintiff cannot demonstrate that the basis is a pretext. The defendant further contended that the plaintiff's claim that it aided and abetted its agent's discriminatory conduct failed because (1) the plaintiff could not establish a material issue of fact as to his discrimination and retaliatory discharge claims, which are predicates to a claim of aiding and abetting, and (2) the defendant cannot be liable for aiding and abetting agents who are not parties to the present action. The defendant appended affidavits from Cifuentes, Hagan, Alejandro and Joseph Deming, superintendent of the apartments, and other documents to its memorandum of law in support of summary judgment.

The plaintiff filed an objection to the defendant's motion for summary judgment on October 3, 2016. He asserted that there were genuine issues of material fact and that he had demonstrated a prima facie case of employment discrimination, retaliatory discharge and aiding and abetting under the act. The plaintiff attached his own affidavit to his memorandum of law. The defendant filed a reply to the plaintiff's objection in which it contended that the plaintiff had failed to present evidence that could persuade a rational fact finder that the defendant's legitimate, nondiscriminatory reason for terminating the plaintiff's employment is false or pretextual.

The parties argued the motion for summary judgment on November 7, 2016. The court issued its memorandum of decision on February 15, 2017. The court set forth the procedural history of the case and identified the exhibits the defendant had submitted in support of summary judgment. After setting forth the standards for summary judgment and the legal principles governing employment discrimination claims, the court found that the defendant was entitled to summary judgment on each count of the complaint by meeting its burden of proving the absence of a genuine issue of material fact.[4]

With respect to the plaintiff's claim of employment discrimination, the court cited the controlling statute. Section 46a-60 (a) provided in relevant part: "It shall be a discriminatory practice . . . (1) [f]or an employer . . . to discharge from employment any individual . . . because of the individual's . . . religious creed . . . ." The court found that the plaintiff alleged that on March 13, 2012, he was hired by the defendant to be a cleaner/porter at the apartments, and that he is the pastor at the church. During the course of his duties at the apartments, the plaintiff frequently greeted tenants with the phrase "God bless" and spent time talking with them. Cifuentes warned the plaintiff on June 14, 2012, about interacting with tenants as he had been doing. On June

22, 2012, Hagan received information that the plaintiff, during a service at the church, read the names of tenants who were in jeopardy of being evicted from the apartments. On June 26, 2012, Hagan requested that Cifuentes terminate the plaintiff from his position. Cifuentes discharged the plaintiff on August 3, 2012, on the basis of his spending too much time talking with tenants and acting inappropriately when he read the names of tenants at church. The court concluded that the plaintiff had not demonstrated that his firing occurred under circumstances giving rise to a prima facie inference of discrimination. The plaintiff merely had "alleged the conclusory statement that [b]ecause [the] [d]efendant disapproved of [the] plaintiff's use of religious terms while at work and was aware of his status as a pastor, [the] plaintiff has shown direct evidence of discriminat[ory] motive." (Internal quotation marks omitted.) The court concluded that the plaintiff had not satisfied a prima facie case of employment discrimination under § 46a-60 (a) (1). The defendant demonstrated the absence of any genuine issue of material fact regarding the lack of circumstances giving rise to an inference of religious discrimination.

As to the retaliatory discharge claim alleged in count two, the court cited § 46a-60 (a) (4). Section 46a-60 (a) provided in relevant part: "It shall be a discriminatory practice . . . (4) [f]or any . . . employer . . . to discharge, expel or otherwise discriminate against any person . . . because such person has filed a complaint or testified or assisted in any proceeding under section 46a-82, 46a-83 or 46a-84 . . . ." The defendant asserted that the plaintiff had failed to allege that he had engaged in a protected activity. The plaintiff responded that he engaged in a protected activity when he openly used religious terms at work, spoke out against the defendant by communicating with Martinez and referred to him as chaplain, contrary to the defendant's instructions, and that the defendant retaliated against him by firing him. The court concluded that the protected activity the plaintiff claimed was not a protected activity under the act and, therefore, he had failed to establish a prima facie case of retaliation.

In regard to count three, § 46a-60 (a) provided in relevant part: "It shall be a discriminatory practice . . . (5) [f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any act declared to be a discriminatory employment practice or to attempt to do so . . . ." The court found that the plaintiff alleged that the defendant aided and abetted discriminatory conduct, but because the plaintiff failed to assert successfully a prima facie case of employment discrimination, he could not successfully assert a claim of aiding and abetting. Furthermore, the defendant cannot discriminate against the plaintiff and at the same time aid and abet itself in discriminating against him. The court concluded that

the plaintiff's allegations of aiding and abetting failed. Although the plaintiff mentioned the defendant's employee, he did not name the employee as a defendant. The case was commenced against the defendant only. The court, therefore, granted the defendant's motion for summary judgment.

We begin with the standard of review and the legal principles that guide our analysis of appeals from the granting of a motion for summary judgment. "The law governing summary judgment and the accompanying standard of review are well settled. Practice Book § [17-49] requires that judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A material fact is a fact that will make a difference in the result of the case. . . . The facts at issue are those alleged in the pleadings." (Internal quotation marks omitted.) *Marasco* v. *Connecticut Regional Vocational-Technical School System*, 153 Conn. App. 146, 154, 100 A.3d 930 (2014), cert. denied, 316 Conn. 901, 111 A.3d 469 (2015).

"In seeking summary judgment, it is the movant who has the burden of showing the nonexistence of any issue of fact. The courts are in entire agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles of substantive law, entitle him to a judgment as a matter of law. The courts hold the movant to a strict standard. To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. . . . As the burden of proof is on the movant, the evidence must be viewed in the light most favorable to the opponent. . . .

"The party opposing a motion for summary judgment must present evidence that demonstrates the existence of some disputed factual issue . . . . The movant has the burden of showing the nonexistence of such issues but the evidence thus presented, if otherwise sufficient, is not rebutted by the bald statement that an issue of fact does exist. . . . To oppose a motion for summary judgment successfully, the nonmovant must recite specific facts . . . which contradict those stated in the movant's affidavits and documents. . . . The opposing party to a motion for summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue. . . . The existence of the genuine issue of material fact must be demonstrated by counteraffidavits and concrete evidence. . . .

"[T]ypically [d]emonstrating a genuine issue requires a showing of evidentiary facts or substantial evidence

outside the pleadings from which material facts alleged in the pleadings can be warrantably inferred. . . . Moreover, [t]o establish the existence of a material fact, it is not enough for the party opposing summary judgment merely to assert the existence of a disputed issue. . . . Such assertions are insufficient regardless of whether they are contained in a complaint or a brief. . . . Further, unadmitted allegations in the pleadings do not constitute proof of the existence of a genuine issue as to any material fact. . . .

"Although the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion . . . a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *Walker* v. *Dept. of Children & Families*, 146 Conn. App. 863, 869–71, 80 A.3d 94 (2013), cert. denied, 311 Conn. 917, 85 A.3d 653 (2014). "Requiring the nonmovant to produce such evidence does not shift the burden of proof. Rather, it ensures that the nonmovant has not raised a specious issue for the sole purpose of forcing the case to trial." (Internal quotation marks omitted.) Id., 871. "The fundamental purpose of summary judgment is preventing unnecessary trials." *Stuart* v. *Freiberg*, 316 Conn. 809, 822, 116 A.3d 1195 (2015).

"The burden of proof that must be met to permit an employment-discrimination plaintiff to survive a summary judgment motion at the prima facie stage is de minim[i]s. . . . Since the court, in deciding a motion for summary judgment, is not to resolve issues of fact, its determination is whether the circumstances giv[e] rise to an inference of discrimination must be a determination of whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive." (Citation omitted; internal quotation marks omitted.) *Chambers* v. *TRM Copy Centers Corp.*, 43 F.3d 29, 37–38 (2d Cir. 1994). "Though caution must be exercised in granting [a motion for] summary judgment where intent is genuinely in issue . . . summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." (Citation omitted.) Id., 40.

"On appeal, [an appellate court] must determine whether the legal conclusions reached by the trial court are legally and logically correct and whether they find support in the facts set out in the memorandum of decision of the trial court. . . . [Appellate] review of the trial court's decision to grant [a] defendant's motion for summary judgment is plenary." (Internal quotation marks omitted.) *Rivers* v. *New Britain*, 288 Conn. 1, 10, 950 A.2d 1247 (2008).

I

The plaintiff first claims that the court improperly concluded that the pretext/*McDonnell Douglas-Burdine* model of analysis applied to its adjudication of the defendant's motion for summary judgment rather than the mixed-motive/*Price Waterhouse* model of analysis. We do not agree.

"Connecticut statutorily prohibits discrimination in employment based upon race, color, religious creed, age, sex, marital status, national origin, ancestry, present or past history of mental disorder, mental retardation, and learning disability or physical disability. General Statutes § 46a-60 (a) (1)." *Levy* v. *Commission on Human Rights & Opportunities*, 236 Conn. 96, 102, 671 A.2d 349 (1996). Our courts look to federal precedent for guidance in applying the act. *Miko* v. *Commission on Human Rights & Opportunities*, 220 Conn. 192, 202, 596 A.2d 396 (1991).

"The legal standards governing discrimination claims involving adverse employment actions are well established." *Feliciano* v. *Autozone, Inc.*, 316 Conn. 65, 73, 111 A.3d 453 (2015). Generally, there are four theories of employment discrimination under federal law. *Levy* v. *Commission on Human Rights & Opportunities*, supra, 236 Conn. 103. In the present case, the plaintiff alleges religious discrimination on the basis of disparate treatment. "[D]isparate treatment simply refers to those cases where certain individuals are treated differently than others. . . . The principal inquiry of a disparate treatment case is whether the plaintiff was subjected to different treatment because of his . . . protected status." (Citation omitted; footnote omitted; internal quotation marks omitted.) Id., 104. "Under the analysis of the disparate treatment theory of liability, there are two general methods to allocate the burdens of proof: (1) the mixed-motive/*Price Waterhouse* model . . . and (2) the pretext/*McDonnell Douglas-Burdine* model." (Citation omitted.) Id., 104–105; see footnote 1 of this opinion.

"A mixed-motive [*Price Waterhouse*] case exists when an employment decision is motivated by both legitimate and illegitimate reasons. . . . In such instances, a plaintiff must demonstrate that the employer's decision was motivated by one or more prohibited statutory factors. Whether through direct evidence or circumstantial evidence, a plaintiff must submit enough evidence that, if believed, could reasonably allow a [fact finder] to conclude that the adverse employment consequences resulted because of an impermissible factor. . . .

"The critical inquiry [in a mixed-motive case] is whether [a] discriminatory motive was a factor in the [employment] decision at the moment it was made." (Citations omitted; footnote omitted; internal quotation marks omitted.) Id., 105. "Under [the mixed-motive]

model, the plaintiff's prima facie case requires that the plaintiff prove by a preponderance of the evidence that he . . . is within a protected class and that an impermissible factor played a motivating or substantial role in the employment decision. . . . Once the plaintiff has established his prima facie case, the burden of production and persuasion shifts to the defendant. [T]he defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken [the impermissible factor] into account. . . .

"If a plaintiff cannot prove directly the reasons that motivated an [adverse] employment decision, the plaintiff may establish a prima facie case under the *McDonnell Douglas-Burdine* or pretext model of analysis. . . . [T]o establish a prima facie case of discrimination . . . the [plaintiff] must demonstrate that (1) he is in the protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) that the adverse action occurred under circumstances giving rise to an inference of discrimination. . . . The level of proof required to establish a prima facie case is minimal and need not reach the level required to support a jury verdict in the plaintiff's favor. . . .

"Under the *McDonnell Douglas-Burdine* model, the burden of persuasion remains with the plaintiff. . . . Once the plaintiff establishes a prima facie case, however, the burden of production shifts to the defendant to rebut the presumption of discrimination by articulating (not proving) some legitimate, nondiscriminatory reason for the plaintiff's [discharge]. . . . Because the plaintiff's initial prima facie case does not require proof of discriminatory intent, the *McDonnell Douglas-Burdine* model does not shift the burden of persuasion to the defendant." (Citations omitted; internal quotation marks omitted.) *Jones* v. *Dept.* of *Children & Families*, 172 Conn. App. 14, 24–25, 158 A.3d 356 (2017)

In its memorandum of decision, the court noted the two models of analysis utilized in employment discrimination cases. As stated in a footnote of its decision, the court elected to utilize the pretext/*McDonnell Douglas-Burdine* model of analysis after finding that the plaintiff was not claiming that he was discharged from employment due to mixed motives of legitimate and illegitimate reasons. The court found that the plaintiff claimed that the reason for his employment termination offered by the defendant, namely, his excessive socialization with tenants of the apartments, is a pretext for illegal religious discrimination.

On the basis of our plenary review of the plaintiff's complaint and his affidavit in opposition to the defendant's motion for summary judgment, we conclude that the plaintiff did not allege or present facts that he was fired for both legitimate and illegitimate reasons. We, therefore, agree with the trial court that the pretext/

*McDonnell Douglas-Burdine* model of analysis applied to the adjudication of the defendant's motion for summary judgment.

## II

The plaintiff's second claim on appeal is that, even if the court properly determined that the pretext/ *McDonnell Douglas-Burdine* model of employment discrimination analysis was appropriate, the court improperly found that the defendant had demonstrated the absence of any genuine issue of material fact as to whether the circumstances under which he was discharged from employment gave rise to a prima facie inference of discrimination. We do not agree.

Under the pretext/*McDonnell Douglas-Burdine* model of analysis, "the employee must first make a prima facie case of discrimination. . . . In order for the employee to first make a prima facie case of discrimination, the plaintiff must show: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position; (3) the plaintiff suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination. . . . The employer may then rebut the prima facie case by stating a legitimate, nondiscriminatory justification for the employment decision in question. . . . This burden is one of production, not persuasion . . . . The employee then must demonstrate that the reason proffered by the employer is merely a pretext and that the decision actually was motivated by illegal discriminatory bias." (Citations omitted; internal quotation marks omitted.) *Feliciano* v. *Autozone, Inc.*, 142 Conn. App. 756, 769–70, 66 A.3d 911 (2013), rev'd in part on other grounds, 316 Conn. 65, 111 A.3d 453 (2015); see also *Craine* v. *Trinity College*, 259 Conn. 625, 636–37, 791 A.2d 518 (2002).

Circumstances contributing to a permissible inference of discriminatory intent under the fourth prong of the *McDonnell Douglas-Burdine* model include: (1) the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; (2) the employer's criticism of the plaintiff's performance in ethnically degrading terms or invidious comments about others in the employee's protected group; (3) the more favorable treatment of employees not in the protected group; or (4) the sequence of events leading to the plaintiff's discharge or the timing of the discharge. See *Chambers* v. *TRM Copy Centers Corp.*, supra, 43 F.3d 37.

The defendant set forth the following facts in support of its motion for summary judgment.[5] The defendant employed the plaintiff as a cleaner/porter at the apartments from March, 2012 through August 3, 2012. The apartments are managed by the defendant's long-standing customer, WinnResidential, for whom it provided

cleaning and maintenance services at numerous locations. At all relevant times, the defendant employed a five member "crew" to provide cleaning and maintenance services at the apartments. The crew consisted of four cleaners/porters and one working supervisor, who reported to Cifuentes.[6]

While he was employed by the defendant, the plaintiff was supervised by Martinez, a friend and colleague of the plaintiff from the church. Martinez referred and recommended the plaintiff to Cifuentes to fill a vacant position on the crew. Martinez informed Cifuentes that the plaintiff was his friend and a leader of his church. Prior to hiring the plaintiff, Cifuentes cautioned Martinez that if the defendant hired the plaintiff, Martinez could not treat him any differently than Martinez treated other members of the crew. He instructed Martinez to treat all members of the crew fairly and equally and not to give preferential treatment to any of the members of the crew, even if the crew member was a friend outside of work. In addition, to ensure that the crew delivered efficient and reliable high quality services the defendant and its customers expected, the defendant's employees were trained and instructed to limit their interaction with tenants and its customers' employees at customer work locations.

In May and early June, 2012, Cifuentes received complaints from members of Martinez' crew that Martinez was not distributing work assignments fairly. The members of the cleaning crew complained that Martinez frequently assigned "easy" jobs to the plaintiff while other members of the crew were assigned more demanding work. He also permitted the plaintiff to take extra breaks and to spend time talking and socializing with tenants of the apartments during working hours, instead of working. After he received the complaints from members of the crew, Cifuentes reminded Martinez of his responsibilities as a supervisor of the crew and of the importance of treating all members of the crew equally. Cifuentes informed Martinez that he had received several complaints from members of the crew that Martinez was giving the plaintiff preferential treatment and permitting him to socialize with tenants instead of working. Cifuentes reminded Martinez that, as supervisor, it was his responsibility to ensure that the plaintiff focused on work and minimized his interaction with tenants during working hours. Cifuentes reminded Martinez that he should not treat the plaintiff more favorably than he treated other members of his crew.

In June, 2012, Cifuentes learned that Alejandro observed the plaintiff on many occasions standing in the lobby talking with tenants when he should have been working, frequently taking breaks from work to talk with tenants and to engage in conversations about God, religion and church. The plaintiff walked away from tenants with whom he was speaking when Alejan-

dro got closer to him. Deming witnessed similar conduct on the part of the plaintiff. In addition, Cifuentes learned that Alejandro had received complaints from members of Martinez' crew that Martinez was assigning "easy" jobs to the plaintiff, while they were assigned more difficult and demanding tasks. According to Deming, the plaintiff and Martinez were not performing to WinnResidential standards and work was not being completed or timely done.

Also in June, Hagan, Alejandro and Deming discussed staff performance. It was at this time that Hagan learned that Martinez was giving preferential treatment to the plaintiff. She believed that Martinez' treatment of the plaintiff was not conducive to a good working environment because Martinez, as supervisor, should have treated each member of the crew equally and fairly. The fact that Martinez was not treating them fairly and equally led other members of the crew to complain to Alejandro. Hagan reported Martinez' and the plaintiff's conduct to Cifuentes and requested that he address the complaints with them.

On June 14, 2012, Cifuentes met first with Martinez and then with both the plaintiff and Martinez. When he met with Martinez, Cifuentes expressed his concern about Martinez' performance as a supervisor and gave him a verbal warning. He admonished Martinez to treat all members of the cleaning crew equally and to limit the plaintiff's nonwork interactions with the tenants of the apartments. When Cifuentes met with the plaintiff and Martinez together, he instructed the plaintiff to focus on work and to minimize his interaction with tenants of the apartments during work hours. Cifuentes issued a written warning to the plaintiff. The plaintiff refused to sign the warning or make comments in the space provided.

On June 22, 2012, Hagan sent an e-mail message to Cifuentes concerning an incident involving the plaintiff and Martinez. It had come to Hagan's attention via complaints from tenants that, during a service at the church, the plaintiff had read the names of tenants who were going to be evicted from their apartments due to "bad" housekeeping, nonpayment of rent, and for being "bad" tenants. Hagan was concerned that someone had accessed this private and confidential information from the management office and was misusing it. She considered it a violation of WinnResidential's policy regarding professional conduct and its restrictions on the use of information viewed or obtained while performing job responsibilities.[7] On or about June 26, 2012, Hagan requested that Cifuentes remove the plaintiff and Martinez from their positions.

In his affidavit, Cifuentes attested that the defendant viewed WinnResidential's concerns as a serious issue because the defendant strove to provide the best possible service to its customers. It is the defendant's custom

and practice to comply, as soon as practicable, with a customer's legitimate request for removal of its employees from a work site. Given WinnResidential's request, as well as his ongoing concern about the way in which the plaintiff and Martinez were performing, Cifuentes determined that it was necessary to replace them as soon as the defendant was able to hire qualified replacements. As a result of the defendant's hiring requirements, which include drug testing and background checks, it took the defendant approximately six weeks to hire qualified replacements.

Cifuentes further attested that it is very important to the defendant that WinnResidential be satisfied with the quality of workers the defendant assigns to properties WinnResidential manages. The defendant was concerned that failing to accommodate Hagan's request that the plaintiff and Martinez be removed would "put the whole account in jeopardy," which could have cost five other people to lose their jobs.

On August 3, 2015, Cifuentes fired both the plaintiff and Martinez.[8] The plaintiff's termination report states that he had "been warned in the past regarding his conduct while at work, particularly keeping his interactions with residents to a minimum," and that "due to ongoing conduct and performance issues," the plaintiff's employment was terminated. On a Department of Labor form titled "Notice to Employer of Hearing and Unemployment Compensation Claim," and dated August 8, 2012, the plaintiff wrote: "I was discharged for talking excessively to building residents."

The plaintiff opposed the defendant's motion for summary judgment by presenting facts that are for the most part consistent with those presented by the defendant. The plaintiff represented that at the time the defendant hired the plaintiff, Cifuentes was aware that the plaintiff was the pastor of the church and that Martinez was a chaplain. Cifuentes had told Martinez that while he was at work, Martinez could not refer to the plaintiff as "pastor" or give him the respect ordinarily given to a pastor. In June, 2012, Hagan was advised by other members of the crew that Martinez was giving the plaintiff easier work. Consequently, Hagan met with the plaintiff and Martinez to address complaints she had received from tenants. Hagan warned the plaintiff about speaking to tenants and using terms such as "God bless" while he was at work. Hagan reported to Cifuentes "what she heard about [the plaintiff] from [Alejandro] and the [Cintrons]."[9]

On June 26, 2012, Hagan requested that the plaintiff and Martinez be removed from their positions. Cifuentes fired the plaintiff on August 3, 2012. Martinez was present at the time the plaintiff was fired. When Martinez referred to the plaintiff as pastor, Cifuentes allegedly became angry and fired Martinez as well. The plaintiff also attested that during his term of employ-

ment he had no performance or conduct issues.[10]

In deciding the defendant's motion for summary judgment as to count one of the complaint, the court recited the evidence submitted by the parties and concluded that the pretext/*McDonnell Douglas-Burdine* model of analysis applied. For purposes of the motion for summary judgment, the defendant assumed that the plaintiff met the first three prongs of employment discrimination under the model, i.e., that the plaintiff was a member of a protected class, he was qualified for the position, and he suffered an adverse employment action by the defendant. The court agreed with the defendant that the plaintiff had not demonstrated that the termination of his employment occurred under circumstances giving rise to an inference of discrimination. The court found that the plaintiff simply alleged the conclusory statement that "[b]ecause [the] [d]efendant disapproved of [the] plaintiff's use of religious terms while at work, and was aware of his status as a pastor, [the] plaintiff has shown direct evidence of discriminat[ory] motive." (Internal quotation marks omitted.) The court concluded, therefore, that the plaintiff did not satisfy a prima facie case of employment discrimination under § 46a-60 (a) (1), and that the defendant had met its burden of showing the absence of any genuine issue of material fact regarding the lack of circumstances giving rise to an inference of discrimination

On appeal, the plaintiff argues that the court erred in concluding that there were no genuine issues of material fact because the trial court should be cautious when granting a motion for summary judgment when an employer's motive is in question. See *Tryon* v. *North Branford*, 58 Conn. App. 702, 707, 755 A.2d 317 (2000). The plaintiff cites the affidavits of Hagan and Alejandro as the basis of his claim of having established a prima facie case of discrimination. Both Hagan[11] and Alejandro[12] attested that the plaintiff engaged tenants of the apartments in conversations about God and church; Hagan warned the plaintiff about using the term "God bless" and engaging tenants in conversation. The plaintiff argues that the warning gives rise to an inference of discrimination against the plaintiff on the basis of his religion.

"[R]emarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark." *Tomassi* v. *Insignia Financial Group, Inc.*, 478 F.3d 111, 115 (2d Cir. 2007), abrogated in part on other grounds by *Gross* v. *FBL Financial Services, Inc.*, 557 U.S. 167, 177–78, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009). We first note that both Hagan and Alejandro were employed by WinnResidential; they were not employed by the defendant. Second, Cifuentes' job was to ensure that the defendant's

employees performed services to the satisfaction of its customers. He received complaints from Hagan that the plaintiff was talking to tenants about church and God during working hours. Cifuentes warned the plaintiff that during working hours he was to keep his interaction with the tenants to a minimum. Cifuentes was motivated to fire the plaintiff in June, 2012, when Hagan informed him that WinnResidential did not want the plaintiff, or Martinez, to work at any of its properties because the plaintiff received preferential treatment from Martinez, he spent time socializing with tenants when he was supposed to be working, and he discussed God and church with the tenants during working hours. Also, tenants reported that during a church service, the plaintiff published a confidential list of names of tenants who were in danger of eviction. Cifuentes understood that, if WinnResidential was not happy with the manner in which the plaintiff was doing his job and wanted him dismissed, the defendant risked losing the account if it did not fire him.

"Circumstances contributing to a permissible inference of discriminatory intent may include [1] the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position . . . or [2] the employer's criticism of the plaintiff's performance in ethnically degrading terms . . . or its invidious comments about others in the employee's protected group . . . or [3] the more favorable treatment of employees not in the protected group . . . or [4] the sequence of events leading to the plaintiff's discharge . . . or the timing of the discharge . . . ." (Citations omitted.) *Chambers* v. *TRM Copy Centers Corp.*, supra, 43 F.3d 37.

The plaintiff does not dispute that the defendant had a policy that its employees keep their interactions with tenants of the apartments to a minimum during working hours. He also does not dispute that his conversations with tenants were disfavored by WinnResidential and created a business problem for the defendant. He was warned about his behavior and knew that he was not to discuss church and God with tenants when he was to be working. Cifuentes attested that he had informed the plaintiff of the complaints that he had received from Hagan and others. The plaintiff does not take issue with the contents of Cifuentes' affidavit. The written warning the plaintiff received contains no references to religion or church. Cifuentes did not speak of the protected group in ethnically or religiously degrading terms. No matter what the topic, religion or otherwise, the defendant's policy was for its employees not to socialize with tenants during working hours. No discriminatory intent can be inferred from the defendant's policy.

As to the third *Chambers* factor, the plaintiff has failed to point to any evidence that the defendant treated other employees more favorably than it treated

him. To the contrary, Martinez gave the plaintiff preferential treatment. This factor weighs against the plaintiff.

The plaintiff claims that the sequence of events leading to his firing leads to an inference of discriminatory intent on the basis of religion. Significantly, we note that Cifuentes hired the plaintiff in March, 2012, upon the recommendation of Martinez. Cifuentes knew at that time that the plaintiff was the pastor of the church and that Martinez was chaplain in the church. At the time he hired the plaintiff, Cifuentes warned Martinez that, as crew supervisor, he had to treat all members of the crew fairly. Within three months, Cifuentes received information from Hagan that Martinez was giving the plaintiff preferential treatment by assigning him less challenging tasks than he assigned to other members of the crew. Martinez gave the plaintiff breaks when he could talk to tenants about God and church. On June 14, 2012, Cifuentes warned both the plaintiff and Martinez that the plaintiff needed to focus on his work and not socialize with tenants during working hours. On June 26, 2012, Hagan informed Cifuentes that WinnResidential did not want the plaintiff to work at the apartments. Cifuentes decided that he would fire the plaintiff when he found a qualified replacement. Cifuentes met with the plaintiff on August 3, 2012, and discharged him from employment. The evidence presented by the defendant demonstrates that the plaintiff's discharge was not related to his religion but, instead, concerned his failure to comply with the defendant's policy of limiting his interaction with tenants during working hours. Moreover, WinnResidential, the defendant's customer, was dissatisfied with the plaintiff's performance and requested that he not work at any of the properties that it managed. The plaintiff failed to produce any concrete evidence to contradict the facts presented by the defendant. For the foregoing reasons, the plaintiff's claim fails.

### III

The plaintiff's third clam is that the court improperly rendered summary judgment because the defendant failed to show the absence of any genuine issue of material fact as to whether he had engaged in a protected activity with regard to the plaintiff's claim of retaliation under § 46a-60 (a) (4). We disagree.

In count two of the complaint, the plaintiff realleged his claim of employment discrimination and, among other things, that he held a bona fide religious belief and that he was the pastor of the church. He also alleged that the defendant and its agents knew that he was the pastor of the church and that Martinez was the chaplain in the church. He also alleged that the defendant and its agents retaliated against him for practicing his religious beliefs, including, but not limited to, using the terms "pastor" and "chaplain."

In ruling on the defendant's motion for summary judgment, the trial court found that the plaintiff alleged that he had engaged in a protected activity when he "openly used religious terms at work that he was legally permitted to use," "spoke out against [the] defendant by communicating with Martinez, and referring to him as chaplain, contrary to what [the] defendant instructed him to do," and "because of [the] plaintiff's engagement in this protected activity, [the] defendant retaliated against him by terminating his employment." (Internal quotation marks omitted.) The court, however, concluded that the protected activity cited by the plaintiff is not protected under the act. The plaintiff, therefore, has not presented evidence that he engaged in a protected activity and has failed to establish a prima facie case of retaliation. Thus, the defendant has met its burden of showing the absence of any genuine issue of material fact regarding its alleged retaliation against the plaintiff. The court, therefore, granted the motion for summary judgment with respect to the plaintiff's retaliation claim.

Section 46a-60 (a) provides in relevant part: "It shall be a discriminatory practice in violation of this section . . . (4) [f]or any . . . employer . . . to discharge . . . or otherwise discriminate against any person because such person has opposed any discriminatory employment practice or because such person has filed a complaint or testified or assisted in any proceeding under section 46a-82, 46a-83 or 46a-84 . . . ."

A prima facie case of retaliation requires a plaintiff to show (1) that he or she participated in a protected activity that is known to the defendant, (2) an employment action that disadvantaged the plaintiff and (3) a causal relation between the protected activity and the disadvantageous employment action. See *Hebrew Home & Hospital, Inc.* v. *Brewer*, 92 Conn. App. 762, 770, 886 A.2d 1248 (2005). "The term protected activity refers to action taken to protest or oppose statutorily prohibited discrimination." (Internal quotation marks omitted.) *Jarrell* v. *Hospital for Special Care*, 626 Fed. Appx. 308, 311 (2d Cir. 2015). "The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of [coworkers] who have filed formal charges." (Internal quotation marks omitted.) *Matima* v. *Celli*, 228 F.3d 68, 78–79 (2d Cir. 2000).

"An employee's complaint may qualify as protected activity . . . so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." (Internal quotation marks omitted.) *Kelly* v. *Howard I. Shapiro & Associates Consulting Engineers, P.C.*, 716 F.3d 10, 14 (2d

Cir. 2013). "The reasonableness of the plaintiff's belief is to be assessed in light of the totality of the circumstances." *Galdieri-Ambrosini* v. *National Realty & Development Corp.*, 136 F.3d 276, 292 (2d Cir. 1998).

We agree with the trial court that the plaintiff's allegations and the facts of the present case do not constitute a protected activity, and the plaintiff also did not establish that the defendant knew that the plaintiff was engaged in a protected activity. On appeal, the plaintiff claims that his continuing to use religious terms during working hours in contravention of the defendant's instructions that he not do so was a form of informal protest.[13] The plaintiff also claims that his refusal to sign the warning notice Cifuentes presented to him was an informal protest. The defendant points out, however, that the space provided on the warning notice provided the plaintiff with a means of protesting the defendant's alleged discrimination and would have been a protected activity, but the plaintiff did not take advantage of the opportunity. The form clearly states that the "absence of any statement on the part of the EMPLOYEE indicates his/her agreement with the report as stated."

On the basis of the plaintiff's very own words in the record, we cannot conclude that he had a good faith belief that he was engaged in a protected activity by continuing to use religious terms as an informal protest. Cifuentes wrote on the warning form that he gave the plaintiff on June 14, 2012, "[e]mployee has been seen several times spending too much time talking to residents instead of working." On his claim for unemployment compensation, the plaintiff stated as the reason for his termination: "I was discharged for talking excessively to building residents." The record contains no facts presented by the plaintiff that he continued to use the terms "pastor" and "chaplain" as an informal means of complaint. We, therefore, conclude that the court properly granted the motion for summary judgment in favor of the defendant on the plaintiff's retaliatory discharge claim.[14]

The judgment is affirmed.

In this opinion the other judges concurred.

[1] See *Levy* v. *Commission on Human Rights & Opportunities*, 236 Conn. 96, 104–109, 671 A.2d 349 (1996) (differentiating disparate employment treatment models).

[2] Hereinafter, unless otherwise indicated, all references to § 46a-60 in this opinion are to the 2011 revision of the statute.

[3] The record reflects that this statement was made in connection with the plaintiff's claim for unemployment compensation.

[4] Although the plaintiff claims on appeal that the court improperly determined that there were no genuine issues of material fact, he does not take issue with the court's summary of the facts at issue.

[5] Attached to its memorandum of law in support of the motion for summary judgment were numerous exhibits, including some of the plaintiff's employment records and affidavits from Cifuentes, Hagan, Alejandro and Deming.

[6] Cifuentes was responsible for ensuring that the defendant's employees delivered superior services to its customers. He visited employees at their job sites one to three times a month. He also served as the liaison between the defendant and its customers with respect to complaints.

[7] Hagan also relayed information to Cifuentes that was critical of Martinez alone.

[8] Martinez also commenced an employment discrimination cause of action against the defendant. See *Martinez* v. *Premier Maintenance, Inc.*, 185 Conn. App. 425,    A.3d    (2018).

[9] In his affidavit, the plaintiff denied that during a church service he published the names of tenants who were in jeopardy of being evicted. He claimed that the Cintrons reported that information in retaliation for his having corrected them during a church service about playing music at an inappropriate time. We do not consider the dispute between the Cintrons and the plaintiff a material fact. The material fact is whether the defendant fired the plaintiff because he excessively interacted with tenants of the apartments when he was to be working.

[10] The defendant contradicted the plaintiff's representation about performance and conduct issues by noting that the plaintiff failed to abide by the defendant's policy that employees limit their interaction with tenants and employees of its customers during working hours.

[11] Hagan attested in relevant part:

"7. During the course of their employment with [the defendant], [the plaintiff] and Martinez were not to be engaging in any activities at WinnResidential associated with their positions at the . . . [c]hurch, where [the plaintiff] was a pastor and Martinez was a chaplain.

"8. In May and June of 2012, WinnResidential received various complaints about Martinez and [the plaintiff].

"9. In or about June of 2012, staff performance was discussed among . . . Deming . . . Alejandro . . . and me. It was brought to my attention that Martinez gave preferential treatment to [the plaintiff]. He called him [p]astor in the workplace. We did not want him to do that because it was a title of respect and authority while Martinez was to be the supervisor. It was also not conducive to a good working environment because the supervisor should be treating each of his subordinates fairly and equally—it was creating a problem, as the other three workers were complaining to [Alejandro]. I also was concerned about [f]air [h]ousing [l]aws where religion was not to be discussed at all. It was also brought to my attention that [the plaintiff] engaged in excessive interaction with [apartment tenants] during working hours when he should be working, not socializing. . . .

"11. It was also reported to me that [the plaintiff] was talking to residents about church, religion and God when he was to be working. . . .

"18. On or about June 26, 2012, I told . . . Cifuentes that WinnResidential did not want Martinez or [the plaintiff] to work at [the apartments] or any of its other properties."

[12] Alejandro attested in relevant part:

"9. In or about June of 2012, other [of the defendant's cleaners working at the apartments] expressed their concern to me about [the plaintiff's] excessive interaction with [tenants] during working hours.

"10. I personally saw [the plaintiff] standing in the lobby talking with residents when he should be working. I heard [the plaintiff] talking to residents about church and God when he was to be working. This happened on several occasions. He had been aware that he was not to do this during work hours, and when I arrived, he would start walking away from the persons with whom he was speaking.

"11. Two cleaners complained to me that Martinez assigned [the plaintiff] 'easy' jobs and assigned them the more difficult and demanding jobs. They also complained that Martinez was giving [the plaintiff] preferential treatment, that is, he was given less strenuous work. . . .

"13. Several cleaners complained to me that [the plaintiff] would frequently take breaks from working to speak to residents and engage in conversations about God, religion and church. I also personally observed that.

"14. On or about June 7, 2012, WinnResidential received complaints from its residents, [the Cintrons]. They told Maria Robalino, who was [the] WinnResidential residence service coordinator, that [the plaintiff] read a list of names at their church of WinnResidential residents who were going to be evicted from their units for reasons including bad housekeeping, which is unclean apartments."

[13] On appeal, the plaintiff claims that he referred to Martinez as "chaplain" when they were at work, but there is no evidence to that effect, and more importantly, the plaintiff did not allege that he called Martinez "chaplain" during working hours.

[14] The resolution of the plaintiff's religious discrimination claim is limited to the facts of this case. The plaintiff's claim does not turn on the use of

religious titles and honorifics in the workplace, and we offer no opinion in that regard.

———————————————————————