******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

CITY OF HARTFORD POLICE DEPARTMENT *v.*
COMMISSION ON HUMAN RIGHTS
AND OPPORTUNITIES ET AL.
(AC 43420)

Prescott, Clark and DiPentima, Js.

*Syllabus*

The plaintiff employer appealed to the trial court from the decision of the
defendant Commission on Human Rights and Opportunities sustaining
a claim of ancestry discrimination brought by the plaintiff's employee,
the defendant P, who is Vietnamese. P filed an affidavit of illegal discrimi-
natory practice with the commission following the termination of his
employment as a probationary police officer. P claimed that, after two
negative interactions with a sergeant, K, during which K questioned P's
ancestry and language skills and P stated that he would file a grievance
against K, other sergeants began complaining about his performance,
motivating the plaintiff to terminate his employment. The trial court
rendered judgment affirming the decision of the commission, from which
the plaintiff appealed to this court. *Held* that the trial court improperly
held that there was substantial evidence in the record that P's termina-
tion from employment arose under circumstances that gave rise to an
inference of discrimination: although K's remarks to P were despicable
and K filed a memorandum criticizing P following their negative interac-
tions, there was not substantial evidence in the record to support a
finding of a causal connection between K's remarks and the plaintiff's
decision to terminate P from employment or that K played any role in
the decision to terminate P's employment, as there was no evidence
that the chief of police, who did terminate P's employment, ever saw
K's memorandum, K's memorandum did not recommend that P be termi-
nated, P had received both negative reports before his interactions with
K and positive reports after those interactions, and, contrary to the
findings of the commission's human rights referee that the sergeants
who gave P negative reports following his interactions with K were
influenced by K's animus because they were promoted at the same time
and socialized with K, the other sergeants testified that there was no
particular comradery among that group and that K had no influence on
how they viewed P or that they had no contact at all with K regarding
P; moreover, although the referee was not required to credit the testi-
mony of the police officers, she was not permitted to infer the opposite
of their testimony solely from her disbelief of the testimony; furthermore,
the evidence in the record did not support the referee's conclusion that
the legitimate, nondiscriminatory reasons for P's discharge set forth by
the plaintiff were pretextual and that the decision was motivated by
illegal discriminatory bias, as issues regarding P's truthfulness and
unprofessional demeanor were documented in contemporaneous
reports from both before and after P's interactions with K, P testified
that none of the plaintiff's employees other than K ever treated him
differently due to his ancestry, and K had no role in the decision to
terminate P.

Argued April 19—officially released November 23, 2021

*Procedural History*

Appeal from the decision of the human rights referee
of the named defendant sustaining a complaint of ances-
try discrimination filed by the defendant Khoa Phan
against the plaintiff, brought to the Superior Court in
the judicial district of New Britain and tried to the
court, *Hon. Henry S. Cohn*, judge trial referee; judgment
affirming the decision of the referee, from which the
plaintiff appealed to this court. *Reversed*; *judgment*

*directed.*

*Daniel J. Krisch*, for the appellant (plaintiff).

*Michael E. Roberts*, human rights attorney, with whom, on the brief, was *Megan K. Grant*, human rights attorney, for the appellee (named defendant).

*James V. Sabatini*, for the appellee (defendant Khoa Phan).

*Opinion*

PRESCOTT, J. The plaintiff, City of Hartford Police Department (city), appeals from the judgment of the trial court affirming a decision of the named defendant, the Commission on Human Rights and Opportunities (commission), which concluded that the city had discriminated against the defendant Khoa Phan on the basis of his Asian and Vietnamese ancestry by terminating Phan's employment as a probationary police officer. The primary issue on appeal is whether the trial court improperly concluded that substantial evidence supported the commission's determination that the city intentionally had discriminated against Phan. We conclude that the substantial evidence in the record does not support a determination of intentional discrimination by the city and, accordingly, we reverse the judgment of the trial court.

The following facts, as found by the presiding human rights referee (referee), are relevant to this appeal. Phan, who is Vietnamese, was hired as a police officer for the city on December 14, 2009. He graduated from the police academy on July 2, 2010, and thereafter became a probationary police officer. The full probationary period for new officers lasts one year starting with the commencement of the field training program, which lasts for several weeks. The field training program has four phases. During each phase Phan worked with different sergeants who served as field training officers. Phan's field training officer for phase one was Officer Steven Citta. Phan's field training officer for phase two was Officer Christian Billings.[1] Phan's field training officer for phase three was Officer Vincent Benvenuto. Phan's field training officer for phase four was Citta. Phan completed the training and received a satisfactory rating.

On or about October 29, 2010, Phan received a probationary employee performance evaluation indicating that his performance was satisfactory. Although Phan received a satisfactory evaluation, during phase two of the training program he lost his hat piece.[2] In his report regarding the missing hat piece, Phan wrote that he had reported the lost hat piece to Sergeant Gregory Weston, his supervisor, even though this was not true. According to Phan, another officer had told him to state in his report that he had reported it to Weston, and he did what he was told to do. Weston was angry at Phan for including untrue information about him in the report and instructed Phan to correct the report, which Phan did. Phan received a new hat piece on or about September 20, 2010.

During Phan's probationary period, the sergeant in charge of each shift completed daily observation reports evaluating Phan's performance in the areas of appearance, overall attitude, interpersonal skills, care of equip-

ment, and performance of certain skills such as patrol, investigation, phones and radio, conflict, report writing, and policies and procedures. In these reports, the sergeant indicated whether Phan's work was superior, acceptable, or unsatisfactory in each area. Phan received satisfactory reviews for October, 2010, and November, 2010, with a few mistakes noted on the reports that were typical of new officers. In December, 2010, Phan received seven unsatisfactory ratings; the daily observation report dated December 5, 2010, however, contained a notation that Phan's performance had improved. Phan's ratings in January, 2011, were generally acceptable, and he passed his first probationary employee performance evaluation for the period ending on January 2, 2011.

On January 23, 2011, Phan had the first of two negative encounters with Steven Kessler, a sergeant. On that date, Phan asked Kessler to review his report on a motor vehicle accident. Upon review, Kessler made negative comments about the report, asked Phan how long he had been working at the Hartford Police Department (department), and told Phan that his report "is probably the shittiest thing I've ever read. How did you come up with such bullshit with seven months of training, Phan?" Kessler criticized Phan's grammar and threw the report in the trash. After Phan revised the report, Kessler approved the report with very few changes. Kessler then asked Phan if the victim in the report was Chinese, and Phan responded that he did not know but thought that the victim spoke Cantonese. Kessler asked Phan, "What are you?" Phan replied that he was Vietnamese. In response, Kessler said, "Vietnamese, Cantonese, it's all the same shit, Phan." Kessler then refused to sign Phan's overtime card, stated that Phan was lucky he "didn't wipe [his] ass with [Phan's] report," and swore at Phan.

Phan's next encounter with Kessler was in February, 2011, on the midnight shift, when Phan asked Kessler to sign a domestic abuse arrest warrant. At that time, Kessler again criticized Phan's report writing skills and grammar and gave Phan a grammar lesson. Kessler asked Phan if he had gone to college and taken an English class. He also asked Phan if he had been born in the United States. After Phan indicated that he came to the United States when he was eleven years old, Kessler stated that this "explains [the problem], you know. I know English is a tough language to learn . . . ." Kessler laughed at Phan, asked Phan if the citizens of Hartford have a hard time understanding him, and remarked that hard core criminals must be laughing at Phan when Phan tells them what to do. When Phan asked Kessler to stop, Kessler indicated that he was in charge and would determine when to stop. When Phan stated that he would file a grievance against him, Kessler ordered Phan out of his office and warned Phan that he should be careful about what he said to him or he

would not "be around long."

Kessler told the other sergeants about his concerns regarding Phan, including the fact that Phan had raised his voice when speaking with Kessler and that their interaction became heated. Kessler also spoke to Edward Yergeau, a sergeant and Phan's immediate supervisor, about Phan's performance.[3] Sergeants Paul Cicero, David Marinelli and Kessler were promoted to sergeant together and occasionally socialized outside of work. All sergeants are supervisors who communicate with one another.

On February 14, 2011, Kessler sent an interoffice memorandum to Peter Bergenholtz, a lieutenant and commander of the police academy, regarding deficiencies in Phan's work performance.[4] In the memorandum, Kessler noted that he had followed up with other sergeants who had more frequent contact with Phan and learned that Phan was struggling with his job competency. Kessler also stated that, while he was reviewing the arrest warrant with Phan, Phan was confrontational and argumentative and raised his voice throughout their meeting. Kessler concluded by recommending, in conjunction with Lieutenant Edwin Dailey, the headquarters lieutenant, that Phan be "unplugged" from his current assignment and afforded the opportunity to be retrained on the noted deficiencies as well as supervisor/subordinate relationships.[5]

After the incidents with Kessler, Phan's favorable ratings decreased because numerous supervisors described Phan as argumentative and confrontational. He received an unsatisfactory rating in February, 2011. The summary report for February, signed by Bergenholtz, also indicated that Phan was argumentative with two supervisors on separate occasions.[6] Cicero prepared the daily observation report regarding Phan dated February 4, 2011. In this report, Cicero made negative comments regarding Phan's work performance and indicated that Phan "has a problem comprehending supervisory orders and becomes confrontational and argumentative. [He] [h]as [a] hard time in decision making and understanding complex situations. When unsure of an answer, he has the habit of blaming his [field training officers] for not showing him the proper manner." On February 8, 2011, Marinelli also provided an unfavorable report regarding Phan.

On February 16, 2011, Cicero sent an interdepartmental memorandum to Lieutenant Michael Cacioli describing an incident in which Phan only had five daily observation reports in his folder while the other probationary police officers had approximately forty daily observation reports in their folders. According to the memorandum, Lieutenant Emory Hightower, Cicero, and Marinelli met with Phan about the missing reports. In his memorandum, Cicero concluded that it was apparent that Phan purposely had failed to retrieve all of the

reports regarding him when asked to do so.[7] Kessler was not involved in the incident regarding the missing daily observation reports.

On February 18, 2011, Cacioli sent an interdepartmental memorandum to Captain James Bernier expressing concern that Phan lacked the character necessary to continue as a probationary police officer. The memorandum listed the following categories in which Phan's performance was unsatisfactory based on a review of Phan's daily observation reports: appearance—out of uniform, failure to adhere to policies and procedures, ability to solve problems and decision making, report writing, and overall attitude. Cacioli's memorandum referenced Kessler's memorandum of February 14, 2011, and concluded by stating: "My main concern is not necessarily Officer Phan's appearance or minor report writing corrections. I believe these can be addressed through counseling and retraining. The unsatisfactory marks, as it relates to poor attitude and being confrontational with supervisors, calls into question Officer Phan's integrity and overall attitude to be a police officer. There is no retraining or teachable protocol that can rectify this character flaw and potential liability if Officer Phan is allowed to remain as a Hartford Police Officer."

Also on February 18, 2011, the police academy contacted Phan regarding the hat piece that Phan lost during phase two of his training program. Specifically, Phan was asked whether he still had his hat and hat piece that were issued to him upon his graduation from the Hartford Police Academy. In response to questioning, Phan indicated that he had reported his lost hat to Officer Tyrone Boland, and that Boland had instructed Phan to continue to look for it. Phan later testified that he told Bergenholtz and Jeffrey Rousseau, a sergeant, that Boland had instructed him to write that he had reported his lost hat piece to Sergeant Weston. The referee found that Boland was never interviewed regarding the missing hat piece and the investigation report regarding the missing hat piece did not mention Boland. Kessler was not involved in the investigation regarding Phan's lost hat piece.

On February 25, 2011, Phan met with Bergenholtz and Rousseau to discuss his performance for the period ending on January 2, 2011. At this time, Bergenholtz told Phan that he had heard that Phan had been yelling at Kessler. Although Phan denied yelling at Kessler, Phan stated that he was going to file a grievance against Kessler. In response, Bergenholtz told Phan that he, unlike Kessler, would have fired him immediately for making that remark.

The daily observation summary report regarding Phan for March, 2011, signed by Bergenholtz, indicated that Phan's performance was unsatisfactory.[8] This summary report contained a note that Phan continued to

receive unsatisfactory ratings in overall attitude and that he was involved in an incident in which he demonstrated a dismissive attitude toward a senior officer who was coaching him through an officer safety deficiency.[9] Kessler was not involved in the incident noted in this summary report. On March 28, 2011, Cicero sent another interdepartmental memorandum to Cacioli, summarizing the issues with Phan as set forth in Kessler's memorandum of February 14, 2011, Cicero's memorandum of February 16, 2011, and Cacioli's memorandum of February 18, 2011. This memorandum also described an incident involving Phan's deficient performance in the use of the mobile data terminal (MDT) system.[10] Kessler was not involved in the incident regarding Phan's inability to use the MDT system.

According to Cicero's March 28, 2021 memorandum, Phan was interviewed by the Internal Affairs Division regarding the daily observation reports that were missing from his file folder, as recounted in the February 16, 2011 memorandum. When asked why he did not answer the questions directed to him on February 16, 2011, Phan indicated that he was "slacking, embarrassed, and was 'having a bad day.' " Cicero concluded this memorandum by finding clear and evident violations of two provisions of the department's Code of Conduct.[11]

The summary reports regarding Phan in April and May, 2011, indicated that Phan's performance was acceptable. He received an unfavorable report on June 10, 2011, however, based on an incident that occurred on June 4, 2011. In particular, on that date, Phan assisted Detective Luis Ruiz and Officer Jeffrey Hopkins while in the field in subduing a person who was under the influence of phencyclidine (PCP). Phan was the only Taser certified officer on the scene. During this incident, the person struck Hopkins in the jaw. After Hopkins and Ruiz expressed concern over Phan's failure to use his Taser during the incident, Yergeau, Phan's shift sergeant, met with Phan. On inquiry, Phan explained that he did not hear the instruction to use the Taser and he did not think he had a clear shot.

On June 10, 2011, Yergeau wrote a memorandum to Bergenholtz regarding the incident. According to the memorandum, "Phan initially denied hearing Officer Hopkins telling him to use his Taser weapon. Officer Phan acknowledged he did hear Officer Hopkins tell him to deploy his Taser only after I told him both officers on scene heard the directive and I did not doubt their recall of the incident. Officer Phan then told me he did not use the Taser because he felt he did not have a clear shot at the suspect without the possibility of hitting Officer Hopkins or Detective Ruiz." Yergeau further stated that "Officer Phan's failure to deploy his weapon and his lack of truthfulness with this supervisor leaves this supervisor to question his ability to properly

serve and protect the citizens of Hartford and officers in this department. Officer [Phan] failed to act and he then failed to admit . . . a crucial error in [judgment]. It is my recommendation that Officer Phan be retrained on the use of force and Taser training. His failure to admit an error in judgment or to immediately tell the truth is an issue that goes well beyond the Hartford Police Academy."[12] Kessler was not involved in the June 4, 2011 incident regarding the Taser.

On June 7, 2011, Phan met with Bergenholtz to discuss his April and May performance evaluations. Phan's probationary employee performance evaluation dated June 6, 2011, signed by Rousseau as Phan's immediate supervisor and Bergenholtz as the reviewing authority, indicated a need for improvement for the period ending April 2, 2011.

On June 18, 2011, Chief of Police Daryl K. Roberts dismissed Phan from his position as a probationary police officer. At the time of his dismissal, Roberts gave Phan a copy of Yergeau's June 10, 2011 memorandum regarding the Taser incident and told him that his lack of truthfulness was one of the main reasons he was being dismissed. At the time of Phan's dismissal, Roberts also had a memorandum dated June 16, 2011, from Bergenholtz evaluating Phan's performance. This performance evaluation noted that Phan "demonstrated a need for improvement in the area of Job Knowledge and Skills and the area of Human Relations."[13]

On November 25, 2011, Phan filed an Affidavit of Illegal Discriminatory Practice with the commission alleging that the city terminated his employment as a result of his Asian/Vietnamese ancestry. On March 4, 2015, following a hearing and the filing of posthearing briefs, the referee found in favor of Phan, concluding that the city illegally had discriminated against Phan when it terminated him from his position as a probationary police officer. The referee ordered, inter alia, that the city pay Phan back pay in the amount of $210,596 plus $25,000 as damages for emotional distress.

On June 1, 2016, the trial court, *Schuman, J.*, sustained the city's appeal from the referee's decision and remanded the matter for a new hearing after concluding that the referee improperly had applied the "mixed motive" analysis to the discrimination claim rather than a "pretext" analysis.

By decision dated October 24, 2017, the referee, on remand, again found in favor of Phan, concluding that, under either analysis, the city had discriminated against him. In her decision, the referee stated that "[Phan's] overall performance had been satisfactory until his meetings with Sergeant Kessler. [Phan's] [daily observation reports] actually improved steadily after March until his completion of the probationary period. He was not terminated at the actual time of the lost hat piece,

for failing a section of the field training, despite being a probationary employee who could be terminated for almost any reason. The untimely investigation into [Phan's] hat piece, followed by the one-sided investigation into [Phan's] decision not to use his Taser, and the completely discredited testimony of several of [the city's] witnesses attempting to illustrate [Phan's] untruthfulness regarding the Taser incident, is more than sufficient evidence to prove pretext. There are too many contradictions and inconsistencies to believe that [the city's] termination of [Phan] was legitimate."[14]

The city appealed the referee's second decision to the trial court. On September 4, 2019, the trial court, *Hon. Henry S. Cohn*, judge trial referee, affirmed the decision of the referee.[15] The city then filed the present appeal in which it argues that the trial court improperly held that substantial evidence supports the commission's finding of intentional discrimination. According to the city, the trial court improperly affirmed the commission's decision despite two "gaping holes" in the evidence. Specifically, the city contends that Kessler's " 'stray remarks' " do not permit an inference of discrimination, as Kessler played no part in the decision to terminate Phan. The city further argues that Phan's acts of dishonesty and unprofessional behavior were not pretexts for discrimination, as some incidents occurred before Phan's encounters with Kessler and the incident involving the Taser involved a supervisor with no connection to Kessler. We conclude that Phan failed to satisfy his burden of establishing a prima facie case of discrimination. Moreover, even if Phan had established a prima facie case of discrimination, the record does not support the referee's conclusion that the city's reasons for terminating Phan from employment were pretextual.

"Our review of an agency's factual determination is constrained by General Statutes § 4-183 (j), which mandates that a court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are . . . clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record . . . . This limited standard of review dictates that, [w]ith regard to questions of fact, it is neither the function of the trial court nor of this court to retry the case or to substitute its judgment for that of the administrative agency. . . . An agency's factual determination must be sustained if it is reasonably supported by substantial evidence in the record taken as a whole. . . . Substantial evidence exists if the administrative record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . This substantial evidence standard is highly defer-

ential and permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard of review. . . . The burden is on the [plaintiff] to demonstrate that the [agency's] factual conclusions were not supported by the weight of substantial evidence on the whole record. . . . With respect to questions of law, [w]e have said that [c]onclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts." (Citation omitted; internal quotation marks omitted.) *Board of Education* v. *Commission on Human Rights & Opportunities*, 266 Conn. 492, 503–504, 832 A.2d 660 (2003).

"We look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both. . . . Under this analysis, the employee must first make a prima facie case of discrimination. . . . In order for the employee to first make a prima facie case of discrimination, the [employee] must show: (1) the [employee] is a member of a protected class; (2) the [employee] was qualified for the position; (3) the [employee] suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination." (Citations omitted; internal quotation marks omitted.) *Feliciano* v. *Autozone, Inc.*, 316 Conn. 65, 73, 111 A.3d 453 (2015), citing *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). "The employer may then rebut the prima facie case by stating a legitimate, nondiscriminatory justification for the employment decision in question. . . . This burden is one of production, not persuasion; it can involve no credibility assessment. . . . The employee then must demonstrate that the reason proffered by the employer is merely a pretext and that the decision actually was motivated by illegal discriminatory bias." (Citations omitted; internal quotation marks omitted.) *Feliciano* v. *Autozone, Inc.*, supra, 74.

"Although intermediate evidentiary burdens shift back and forth under this framework, [t]he ultimate burden of persuading the trier of fact that the [employer] intentionally discriminated against the [complainant] remains at all times with the [complainant]. . . . [I]n attempting to satisfy this burden, the complainant—once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision—must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination." (Internal quotation marks omitted.) *Board of Education* v. *Commission on Human Rights & Opportunities*, supra, 266 Conn. 506–507.

Phan's theory of liability before the commission was

that Kessler's discriminatory animus infected or influenced the other sergeants to complain about his performance, motivating the city to terminate his employment. In order to succeed on this claim, Phan had to establish a causal connection between Kessler's remarks and Roberts' decision to terminate Phan's employment. In finding in favor of Phan, the referee concluded that Kessler had "poisoned the well for [Phan]" and that the city was liable for the discriminatory animus of Kessler. The city's appeal challenges the referee's conclusion that Phan had satisfied the fourth prong of the prima facie case, namely, that the adverse action occurred under circumstances giving rise to an inference of discrimination. According to the city, there was no evidentiary basis to find a causal connection between Kessler's offensive remarks and Roberts' decision to terminate Phan's employment. We agree.

In order to establish that an employment action was discriminatory on the basis of a coworker's discriminatory statements, an employee must demonstrate that a nexus exists between the allegedly discriminatory statements and the employer's decision to terminate the employee. See *Feliciano* v. *Autozone, Inc.*, supra, 316 Conn. 76. "[S]tray remarks, even if made by a decision maker, do not constitute sufficient evidence [to support] a case of employment discrimination." (Internal quotation marks omitted.) *Rajaravivarma* v. *Board of Trustees for Connecticut State University System*, 862 F. Supp. 2d 127, 152 (D. Conn. 2012). "Verbal comments constitute evidence of discriminatory motivation when [an employee] demonstrates that a nexus exists between the allegedly discriminatory statements and [an employer's] decision to discharge [the employee]. . . . Often, however, an employer will argue that a purportedly discriminatory comment is a mere stray remark that does not constitute evidence of discrimination. . . . Although courts have often used the term stray remark to refer to comments that do not evince a discriminatory motive, the Second Circuit has found that the term stray remark represented an attempt—perhaps by oversimplified generalization—to explain that the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination. . . .

"Accordingly, the task is not to categorize remarks either as stray or not stray, and disregard [remarks] if they fall into the stray category, but rather to assess the remarks' tendency to show that the [decision maker] was motivated by assumptions or attitudes relating to the protected class. . . . Courts have found the following factors relevant to such a determination: (1) who made the remark, i.e., a [decision maker], a supervisor, or a low-level coworker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, i.e., whether [the finder of fact]

could view the remark as discriminatory; and (4) the context in which the remark was made, i.e., whether it was related to the [decision-making] process." (Citations omitted; internal quotation marks omitted.) Id. In *Jones* v. *Dept. of Children & Families*, 172 Conn. App. 14, 28–31, 158 A.3d 356 (2017), this court rejected an employee's claim that the employer's decision to terminate the employee from employment was tainted by the impermissible bias of the employee's supervisor when "the final termination decision was made after an independent review of the [employee's] performance based on concrete, objective factors . . . ."

Phan and the commission rely on *United Technologies Corp.* v. *Commission on Human Rights & Opportunities*, 72 Conn. App. 212, 804 A.2d 1033, cert. denied, 262 Conn. 920, 812 A.2d 863 (2002), in support of their argument that, under the theory of transferred intent, the city is liable for Kessler's unlawful discrimination. In that case, this court stated that "[o]ur law allows for the transfer of intent to discriminate . . . . It is true that [w]ithout some proof of an improper motive, [a plaintiff's] case must fail. . . . Nevertheless, companies may be held liable for discrimination even where the decision-making official did not intentionally discriminate if the information used by that official in deciding to terminate a worker's employment was filtered through another employee who had a discriminatory motive." (Citation omitted; internal quotation marks omitted.) Id., 234–35.

The defendants' reliance on *United Technologies Corp.* v. *Commission on Human Rights & Opportunities*, supra, 72 Conn. App. 212, is misplaced because, as we later noted in *Jones* v. *Dept. of Children & Families*, supra, 172 Conn. App. 29–30, this court utilized the transferred intent theory prior to the United States Supreme Court's decision in *Staub* v. *Proctor Hospital*, 562 U.S. 411, 131 S. Ct. 1186, 179 L. Ed. 2d 144 (2011), which articulated the " 'cat's paw' " theory of liability. The "cat's paw" theory applies when "an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action." (Internal quotation marks omitted.) *Zuro* v. *Darien*, 432 F. Supp. 3d 116, 129 (D. Conn. 2020). We stated in *Jones* that, "[p]rior to the United States Supreme Court's decision in *Staub*, this court embraced a transferred intent theory that was loosely analogous to the cat's paw theory of liability articulated in *Staub*." *Jones* v. *Dept. of Children & Families*, supra, 30, citing *United Technologies Corp.* v. *Commission on Human Rights & Opportunities*, supra, 234–35.[16]

In *Feliciano* v. *Autozone, Inc.*, supra, 316 Conn. 65, our Supreme Court made clear that transferred intent

was not a sufficient legal basis to hold an employer liable for the discriminatory animus of one of its employees. In *Feliciano*, an employee of a company was accused by the company of improperly using a customer loyalty reward card for her own use. Id., 69. The employee was a black female who was born in the U.S. Virgin Islands and practiced the Rastafarian religion. Id., 68. As part of her religion, she wore her hair in dreadlocks. Id. Following her termination from employment, she commenced an action against the company contending, inter alia, that the company unlawfully had terminated her employment on the basis of her national origin, religion and race. Id., 70. The trial court granted the company's motion for summary judgment in which it claimed that the employee had failed to make out a prima facie case of discrimination. Id., 68. This court affirmed the judgment of the trial court and, following the granting of certification, the plaintiff appealed to the Supreme Court. Id.

On appeal to the Supreme Court, the plaintiff argued that "she presented ample evidence of [a store manager's] discriminatory animus toward her, and that this animus may be imputed to the defendant." Id., 75. Specifically, there was evidence that the plaintiff's supervisor "repeatedly referred to the plaintiff as an 'f'ing Jamaican'; suggested that Jamaicans live in grass huts, wear grass skirts, drink out of coconut shells, and eat cats and dogs; ridiculed the plaintiff's dreadlocks and suggested that her hair was dirty; told the plaintiff that there is no God and that she just had 'false hopes'; suggested that all Rastafarians steal; and mocked the plaintiff by wearing a dreadlocks wig and saying, 'I'm . . . a Rastafarian. Watch me because I steal.' " Id., 76.

In rejecting this claim, the Supreme Court concluded that, "although there was ample evidence that [the store manager] had treated the [employee] in a despicable manner because of her perceived national origin, religion or race, [this court] properly concluded that there was no evidence of a causal connection between [the manager's] discriminatory animus and the [company's] termination of the [employee's] employment." Id., 78. The court further stated that, "[a]lthough disbelief of an employer's explanation for an adverse employment action, *in combination with the plaintiff's prima facie case of discrimination*, may, under some circumstances, be sufficient to meet the [employee's] ultimate burden of proving intentional discrimination . . . disbelief of the employer's evidence is not sufficient to establish a prima facie case of discrimination in the first instance. . . . In the absence of any affirmative evidence of a causal connection between [the manager's] discriminatory animus toward the [employee] and the [company's] termination of her employment, no inference of the defendant's discriminatory intent can be made." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 79–80.

These cases, read together, establish that an employer is not strictly liable for the discriminatory animus of one employee against another employee. Instead, for the employer to be found liable for discrimination, there must be a causal connection between the discriminatory animus of one employee and the adverse employment action suffered by the other employee. As in *Feliciano*, we conclude that Phan has failed to present affirmative evidence of a causal connection between Kessler's remarks and Roberts' decision to terminate Phan's employment. In reaching this conclusion, we in no way condone Kessler's despicable remarks. The legal issue before us, however, is whether, under the facts and circumstances of this case, the city can be held liable for the despicable remarks of its rogue employee. We conclude that it cannot.

We first note that the trial court, in affirming the decision of the referee, stated that a "sufficient nexus" existed to establish a prima facie case because Bergenholtz' "memorandum to [Roberts] included, in addition to other information, Kessler's memorandum to the lieutenant." The referee, however, did not find that Kessler's memorandum was included in the materials that were provided to Roberts; rather, the referee found that, "[w]hen [Phan] met with [Roberts] on June 18, 2011, he was given a copy of . . . Yergeau's memo and was told that his lack of truthfulness was one of the main reasons he was being dismissed." The referee stated that Roberts "also had the June 16, 2011 memo from . . . Bergenholtz evaluating [Phan's] performance" and that "Bergenholtz attached . . . Yergeau's memo to [Phan's] final performance review, which was sent to [Roberts]." Roberts did not testify at the hearing, and there is no evidence in the record indicating that Roberts ever saw Kessler's memorandum. Kessler's memorandum, therefore, does not provide the causal connection necessary to establish a prima facie case.[17]

The referee also relied on her finding that Phan's performance reviews and daily observation reports were satisfactory until the incidents with Kessler and that, "[a]s a result of . . . Kessler's comments and report that [Phan] was argumentative and confrontational, [Phan] began receiving [daily observation reports] with negative comments about his attitude." According to the city, the referee's reliance on the fact that Phan's evaluations worsened after the Kessler incidents is an example of the post hoc ergo propter hoc fallacy, i.e., "the fallacy of saying that because effect A happened at some point after alleged cause B, the alleged cause was the actual cause." (Internal quotation marks omitted.) *Higgins* v. *Koch Development Corp.*, 794 F.3d 697, 703 (7th Cir. 2015). In this regard, we note that "[a] causal connection can be established indirectly by showing that the protected activity was followed close in time by adverse action . . . but the inquiry

into whether temporal proximity establishes causation is factual in nature. There is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between [protected activity] and an allegedly retaliatory action. . . . The trier of fact, using the evidence at its disposal and considering the unique circumstances of each case, is in the best position to make an individualized determination of whether the temporal relationship between an employee's protected activity and an adverse action is causally significant." (Citations omitted; internal quotation marks omitted.) *Ayantola* v. *Board of Trustees of Technical Colleges*, 116 Conn. App. 531, 539, 976 A.2d 784 (2009). "Timing may be an important clue to causation . . . but does not eliminate the need to show causation . . . ." (Citation omitted.) *Bermudez* v. *TRC Holdings, Inc.*, 138 F.3d 1176, 1179 (7th Cir. 1998). Furthermore, an inference of discrimination "may not be based on mere conjecture or surmise." (Internal quotation marks omitted.) *Feliciano* v. *Autozone, Inc.*, supra, 316 Conn. App. 80.[18]

On the basis of our review of the record, we agree with the city that the evidence in the record does not support the referee's conclusion that the incidents with Kessler resulted in Phan's subsequent negative evaluations and eventual termination. Kessler was not one of Phan's field training officers, and he had no role in the decision to terminate Phan. Of the 130 daily observation reports pertaining to Phan that are included in the record, only 7 were prepared by Kessler. These reports, which postdate the incidents in question, reveal that Kessler gave Phan sixty-two acceptable ratings and only two negative ratings.[19] Further, Kessler's memorandum of February 14, 2011, did not recommend that Phan be terminated. Rather, the memorandum "recommend[ed] that . . . [Phan] be 'unplugged' from his current assignment and afforded the opportunity to be retrained on the [noted] deficiencies via [the] Police Academy. Additionally . . . [Phan] should be afforded retraining in supervisor/subordinate relationships."

The testimony also does not support the referee's conclusion that Kessler's discriminatory animosity toward Phan motivated or influenced the other officers to complain about Phan's performance.[20] The referee found it significant that Cicero and Marinelli, who gave negative reports to Phan in February, 2011, were friends of Kessler. In reaching her conclusion, the referee relied on the testimony from Marinelli that he, Kessler and Cicero were all promoted to sergeant at the same time and that they socialized out of work once in a while. Although it is true that Marinelli testified that the sergeants socialized every once in a while, he also testified that he did not "go out much with officers after work" and "kind of keep[s] to [himself]." Marinelli further indicated that there was "not really" a comradery by virtue of having been promoted to sergeant together.[21]

Similarly, Cicero testified that he and Kessler are coworkers and do not socialize outside of work.[22] Thus, although the evidence establishes that the sergeants were promoted at the same time and communicated with one another, it does not support the referee's finding that Kessler's discriminatory comments motivated the other sergeants to complain about Phan, resulting in his termination from employment.

In considering whether Kessler's discriminatory animus motivated Marinelli and Cicero to complain about Phan's attitude, it is also important to note that, according to Phan's own testimony, nobody else in the department or the city of Hartford treated him differently because of his Asian ancestry. Brian Heavren, assistant chief of police, testified that, throughout Phan's probationary period, Phan made no complaints that he was being treated unfairly because of his Asian ancestry. Although Phan received negative reports in February and March, 2011, following his encounters with Kessler, his performance improved and his summaries for April, 2011, and May, 2011, indicated that his performance was acceptable. Furthermore, although Phan received overall acceptable ratings in November, 2010, and December, 2010, prior to his encounters with Kessler, his November, 2010 summary included eight unsatisfactory ratings, including one in the "overall attitude" category and his December, 2010 summary included seven unsatisfactory ratings, including one in the "overall attitude" category.

Kessler testified that he had discussed his concerns regarding Phan with the other sergeants, specifically, that Phan's developmental progress on the job was not reflective of the length of time that he had been on the job. Kessler also testified that he told the other sergeants that he and Phan had raised their voices when speaking with one another and that "things got heated." Kessler also discussed the situation with Yergeau, who was Phan's immediate supervisor at the time. See footnote 3 of this opinion. Although Kessler may have spoken to Yergeau about Phan at some point, Yergeau testified that he did not recall any specific conversations. Yergeau further testified that Kessler did not encourage him to judge Phan more harshly because of the incidents with Kessler and stated that Kessler "has no influence on how I read people" and that he could "make up his own mind." Rousseau, who was involved in the investigation of the missing hat piece, testified that he had no contact with Kessler regarding Phan. Marinelli, who gave Phan unsatisfactory ratings in February, 2011, testified that he did not recall a disagreement between Kessler and Phan over a warrant report. He further testified that the unsatisfactory ratings that he gave to Phan were based on his own observations and that Kessler never made disparaging remarks about Phan in an effort to terminate Phan.

Cicero, Phan's immediate patrol supervisor, made negative comments regarding Phan's performance in his February 4, 2011 daily observation report. Cicero testified that he prepared this report based on his own observations of Phan and that it had nothing to do with Kessler. He testified that he did not have any discussions with Kessler about conversations between Kessler and Phan. Cicero further testified that Kessler did not tell him that he did not want Phan working for the department, nor did he indicate that he had any type of animosity toward Phan. Cacioli, who wrote the memorandum to Bernier based on his review of Phan's daily observation reports, testified that Kessler did not influence his view regarding Phan and that there were no concerns that any of the sergeants were conspiring together to falsify documents or daily observation reports against Phan. Ruiz, the detective involved in the Taser incident on June 4, 2011, testified that, prior to that date, he had no knowledge that Phan had a prior incident involving Kessler. Ruiz further testified that Kessler never talked to him prior to June 4, 2011, regarding Phan and that no one talked to him prior to that date about Phan's performance or a desire not to have him in the department.

There is simply no evidence in the record, therefore, to support the referee's conclusion that Kessler influenced the city's decision to terminate Phan. To the contrary, the testimony of the officers was consistent regarding the fact that Kessler had not influenced them. Furthermore, although we certainly agree that Kessler's comments were despicable, neither Kessler nor the other officers referenced in this opinion were decision makers with regard to the decision to terminate Phan. Bergenholtz testified that he prepared the report that was used for the decision to terminate Phan. Bergenholtz also testified that he and Kessler are not friends and that Kessler never told him that he wanted disciplinary action taken against Phan. Bergenholtz testified that his memorandum was given to the chief of police, but he did not make a recommendation regarding whether to terminate Phan. Heavren testified that the chief of police makes the decision to terminate an employee on behalf of the department, but the director of human resources must concur with that action. Once a decision is made by the chief of police, it is sent to the director of human resources for his final concurrence and, once those signatures are obtained, an employee can be separated from their probationary period. Roberts, the chief of police, did not testify at the hearing.

As stated earlier in this opinion, "[a]lthough disbelief of an employer's explanation for an adverse employment action, *in combination with the plaintiff's prima facie case of discrimination*, may, under some circumstances, be sufficient to meet the plaintiff's ultimate burden of proving intentional discrimination . . . dis-

belief of the employer's evidence is not sufficient to establish a prima facie case of discrimination in the first instance. . . . In the absence of any affirmative evidence of a causal connection between [the supervisor's] discriminatory animus toward the plaintiff and the defendant's termination of her employment, no inference of the defendant's discriminatory intent can be made." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Feliciano* v. *Autozone, Inc.*, supra, 316 Conn. 79–80. The referee in this case was certainly free to disbelieve the testimony of the police officers; she could not, however, infer the opposite of the officers' testimony solely from her disbelief of that testimony. See id., 80.

On the basis of our review of the record, we agree with the city that there was not substantial evidence in the record to support a finding of a causal connection between Kessler's remarks and the city's decision to terminate Phan from employment. The trial court, therefore, improperly held that there was substantial evidence that Phan's termination from employment arose under circumstances that give rise to an inference of discrimination; a requirement for establishing a prima facie case of discrimination. See id., 73.

Moreover, even if Phan had established a prima facie case of discrimination, the evidence in the record does not support the referee's conclusion, as affirmed by the trial court, that the legitimate, nondiscriminatory reasons for Phan's termination set forth by the city were pretextual. Bergenholtz' June 16, 2011 memorandum to Roberts indicates that Phan "was found to have been less than truthful" with several supervisors and had "demonstrated a poor attitude and an unprofessional demeanor" when dealing with supervisors. In the city's brief to the commission following remand, it "set forth its reason for terminating . . . Phan: his overall pattern of poor performance, as well as three incidents: (1) lying in an official police report about having his lost hat and hat piece; (2) concealing [d]aily [o]bservation [r]eports; and (3) being untruthful when questioned about a Taser incident."

"Once the employer produces legitimate, nondiscriminatory reasons for its adverse employment action, the [employee] then must prove, by a preponderance of the evidence, that the employer intentionally discriminated against him." *Board of Education* v. *Commission on Human Rights & Opportunities*, supra, 266 Conn. 506. "The employee . . . must demonstrate that the reason proffered by the employer is merely a pretext and that the decision actually was motivated by illegal discriminatory bias." (Internal quotation marks omitted.) *Alvarez* v. *Middletown*, 192 Conn. App. 606, 613, 218 A.3d 124, cert. denied, 333 Conn. 936, 218 A.3d 594 (2019). "Upon the [employer's] articulation of . . . a non-discriminatory reason for the employment action, the pre-

sumption of discrimination arising with the establishment of the prima facie case drops from the picture." (Internal quotation marks omitted.) Id.

The record in the present case does not support the conclusion that the reasons given for Phan's termination were a pretext and that the decision was motivated by illegal discriminatory bias. As stated earlier in this opinion, Phan testified that, other than Kessler, nobody else in the department or the city of Hartford treated him differently because of his Asian ancestry. Kessler was not one of Phan's field training officers, and he had no role in the decision to terminate Phan. Further, Kessler's February 14, 2011 memorandum regarding Phan did not recommend that Phan be terminated from employment; the memorandum, rather, "recommend[ed] that . . . [Phan] be 'unplugged' from his current assignment and afforded the opportunity to be retrained on the [noted] deficiencies via [the] Police Academy. Additionally . . . [Phan] should be afforded retraining in supervisor/subordinate relationships."

The issues regarding Phan's truthfulness and unprofessional demeanor were documented in contemporaneous daily observation reports and memoranda, some of which occurred before Kessler made his discriminatory remarks and some of which occurred after Kessler uttered those remarks. In particular, the issue involving Phan's missing hat piece occurred in July, 2010, during phase two of his field training program. Although Phan testified that he believed the incident was not investigated until February, 2011, because of his encounters with Kessler, there is no evidence in the record to support Phan's belief. On the contrary, Rousseau, who investigated the missing hat piece, testified that the delay in investigating the missing hat piece was due to Phan's deceptive behavior.[23] Furthermore, as stated earlier in this opinion, although Phan received negative reports in February and March, 2011, following his encounters with Kessler, his performance improved and his summaries for April, 2011, and May, 2011, were acceptable. Even though Phan received overall acceptable ratings in November, 2010, and December, 2010, prior to his encounters with Kessler, his November, 2010 summary included eight unsatisfactory ratings, including one in the "overall attitude" category, and his December, 2010 summary included seven unsatisfactory ratings, including one in the "overall attitude" category.

Finally, the referee and the trial court noted the conflicting testimony regarding whether Phan could have used his Taser during the incident on June 4, 2011, and the fact that the video footage of the incident was consistent with Phan's version of the event. See footnote 12 of this opinion. As pointed out by the city, however, Phan was not terminated from employment for failing to fire his Taser; he was terminated because

he was dishonest and lied about whether he heard the order to fire the Taser. Yergeau's memorandum regarding this incident emphasizes this point: "Officer Phan's failure to deploy his weapon and his lack of truthfulness with this supervisor leaves this supervisor to question his ability to properly serve and protect the citizens of Hartford and officers in this department. Officer [Phan] failed to act and he then failed to admit a crucial error in [judgment]. It is my recommendation that Officer Phan be retrained on the use of force and Taser training. His failure to admit an error in judgment or to immediately tell the truth is an issue that goes well beyond the Hartford Police Academy."

"In assessing pretext, a court's focus must be on the perception of the [decision maker], that is, whether the employer believed its stated reason to be credible . . . . Although an employer's good faith belief is not automatically conclusive . . . [i]t is not enough for [an employee] merely to impugn the veracity of the employer's justification; he must elucidate specific facts which would enable a [finder of fact] to find that the reason given is not only a sham, but a sham intended to cover up the employer's real [and unlawful] motive of discrimination . . . ." (Citations omitted; internal quotation marks omitted.) *Azimi* v. *Jordan's Meats, Inc.*, 456 F.3d 228, 246 (1st Cir. 2006), cert. denied, 549 U.S. 1279, 127 S. Ct. 1831, 167 L. Ed. 2d 319 (2007). In the present case, we disagree with the trial court that there was substantial evidence in the record to establish that the city's reasons for terminating Phan from his employment were pretextual and that the decision was motivated by illegal discriminatory bias.[24]

The judgment is reversed and the case is remanded with direction to render judgment sustaining the city's appeal.

In this opinion the other judges concurred.

[1] Phan's first field training officer for phase two was Officer Tyrone Boland. Phan did not pass phase two of the field training program with Boland. Phan repeated phase two of the training program with Billings and passed on his second attempt. The fact that Phan had to repeat a phase of the program was not an automatic ground for termination.

[2] The hat piece is the shield on top of the hat. At the hearing, Phan acknowledged that losing a hat piece is significant because the person who finds the hat piece could use it to impersonate a police officer.

[3] Although the hearing officer did not explicitly find that Yergeau was Phan's immediate supervisor, Kessler testified that he believed Yergeau was Phan's immediate supervisor.

[4] The memorandum provides: "On or around [February 14, 2011], I had the opportunity to provide report review for Probationary Officer Phan. Through this review it has come to my attention that . . . Phan is not at the level of competency and knowledge that can be expected of a probationary police officer with . . . seven months worth of experience. I am troubled by the deficiencies that were exposed during review of a simple domestic arrest warrant. These deficiencies include but are not limited to:

(1) Inability to explain the importance of completely and adequately completing all of the identifying boxes for the [a]ccused on the face sheet of the arrest warrant.

(2) Not having knowledge of the different databases contained within the in-house system and what information those databases hold.

(3) Inability to log on to the in-house system.

(4) Failing to document investigative steps that provide for the state mandated safety of a domestic violence victim, i.e., inquiring whether accused has access to the residence and offering temporary housing/shelter for the victim, ensuring a quality canvass for the accused is undertaken, attempting to contact the accused.

(5) Noting and documenting observations of injuries and utilizing others such as doctors to provide nature and extent of injuries.

(6) Checking for the presence of [p]rotective/[r]estraining orders."

[5] Kessler testified that being "unplugged" means that the officer is removed from the field pending additional training and that it was not uncommon for officers to be unplugged. He further testified that he did not recommend that Phan be disciplined even though he "probably could initiate [that] himself."

[6] The summary report for February indicated that Phan had received unsatisfactory marks in overall attitude throughout the probationary period. Phan received no unsatisfactory ratings in overall attitude in January, 2011, one unsatisfactory rating in overall attitude in December, 2010, and one unsatisfactory rating in overall attitude in November, 2010.

[7] The memorandum provides: "On [February 6, 2011], while conducting routine maintenance and review of probationary officers [daily observation reports], it was observed that Officer Phan only had five . . . [daily observation reports] in his file folder. A review of his classmates' folders yielded everything filed appropriately and accordingly, with each having roughly forty completed [daily observation reports]. Lieutenant Hightower was made aware of the incident at which time Officer Phan was called into the [l]ieutenant's office after roll call. When asked as to the location of his [daily observation reports], Officer Phan left the office, only to return minutes later with thirteen . . . completed [daily observation reports], still far less than his expected tally. Officer Phan stated that he kept them in his department issued mailbox.

"When asked . . . why they were not in the appropriate file folder and cabinet, Officer Phan would not answer. When asked . . . whether . . . he knew they were supposed to be filed in the cabinet designated particularly for [daily observation reports], he would not answer. It was soon thereafter determined that the five completed [daily observation reports] that were in his folder were placed there by Sergeant [Mark] Vilcinskas, [who] had completed them.

"That while counseled by Lieutenant Hightower and Sergeant Marinelli, I took it upon myself to visually inspect Officer Phan's department issued open mailbox in the roll call room. Fourteen . . . more [daily observation reports] were located, some of which were rated unsatisfactory with additional commentary. When retrieved and brought to Officer Phan's attention, he looked surprised and stated, 'Where did you find those?' It is uncertain as to whether or not Officer Phan had recently pulled his completed [daily observation reports] from his file folder prior to the meeting with him. It is, although, apparent that Officer Phan had purposely failed to retrieve all of the [daily observation reports] from his mailbox as originally asked."

[8] The referee found that Phan's daily observation summary report for March, 2011, indicated one unsatisfactory rating, one superior rating and the remainder satisfactory ratings in the area of overall attitude. The summary reveals, however, that Phan received unsatisfactory ratings in the area of interpersonal skills, performance of patrol, investigative or assigned tasks, ability to perform duties in a safe manner, report writing, and ability to adhere to policies and procedures.

[9] In the daily observation report regarding Phan dated March 3, 2011, prepared by Sergeant Fernando Rodriguez, Jr., Phan received unsatisfactory ratings in the areas of overall attitude and interpersonal skills. Rodriguez explained the unsatisfactory rating as follows: "As for interpersonal skills, it concerns a senior officer, Officer Ward. There was an incident the previous day that involved a deficiency in officer safety . . . . Officer Ward, who was involved in the incident, was attempting to give Officer Phan some sound advice in officer safety. While Officer Ward was in mid-sentence, Officer Phan turned away from Officer Ward, looked at me and apologized for his mistake. He totally disregarded Officer Ward as if he wasn't there. In my opinion, Officer Ward was giving advice to Officer Phan that could very well save his life. I advised Officer Phan that he should pay attention to the advice and criticism given by Officer Ward, a senior officer as well as [a field training officer], as if it was coming from a supervisor. The incident made me feel as if Officer Phan's interpersonal skills, as well as his overall attitude with senior officers, was lacking on this date. He was

counseled on all deficiencies."

[10] The memorandum provided: "On or about February 15, 2011, I asked Officer Phan to send out a message on his MDT to surrounding towns in regards to an attempt to locate on a case that he was working on. Officer Phan stated that he did not know how that function existed on the MDT. I then asked Officer Phan to meet me in the rear of headquarters so that I may show him the proper method. Officer Phan sat in the passenger seat of Unit 420, and was then instructed as to how to send MDT messages to not only Hartford, but surrounding towns as well. When asked as to why he did not know how to properly utilize the system, Officer Phan stated that his field training officers never showed him. I advised Officer Phan that it was also his responsibility to ask his [field training officers], seeing that they may have been under the assumption that the prior [field training officer] had covered that particular area of training.

"Later that evening, I contacted one of his [field training officers], Officer Steve Citta. When asked as to whether or not he trained Officer Phan in regards to the MDT, Officer Citta stated that he had shown Officer Phan all functions of the MDT, and that he had shown proficiency in its usage, as evidenced on his field training [daily observation reports]. It is unclear as to why Officer Phan blamed his [field training officers] for not showing him the proper functions, when it is evident that he was properly trained in the system. I was not Officer Phan's supervisor that evening, therefore [I] did not complete a [daily observation report] in regards to training documentation."

[11] The memorandum provided:

"In regards to the incident . . . which occurred on February 16, 2011, I find clear and evident violations of the two following Code of Conduct Violations.

"Article VI, Section 6.09 For the intentional and willful failure to comply with any lawful order, procedure, directive, or regulation, oral or written.

"-Failing to follow directive and procedure in regards to the proper maintenance and record keeping of completed [daily observation reports].

"Article VI, Section 6.17 Refusal to obey a lawful order of a supervisor.

"-Failing to retrieve all [of] the missing [daily observation reports] when clearly ordered to do so."

[12] The referee found that most of what happened during the incident with the Taser occurred behind a tree, next to a parked ambulance, which sometimes obscured the view from the dash camera recording. The referee found, however, that the video footage of the incident was consistent with Phan's version of the event. The referee further found that "[w]itnesses testified that the undersigned was wrong even when the recording clearly rebutted the witness' testimony of what [had] occurred" and that "[t]his recording and the refusal of the witnesses to acknowledge they remembered incorrectly seriously damaged the [city's] credibility." Although the referee questioned the credibility of the city's witnesses regarding whether Phan could have used his Taser during the incident in question, the referee did not question the fact, as stated in Yergeau's memorandum, that Phan had not been truthful when initially asked why he did not use his Taser.

[13] The performance evaluation provided:

"Job Knowledge and Skills: Officer Phan demonstrated poor tactics when dealing with a person who was allegedly under the influence of an intoxicating substance. Officer Phan was less than truthful when questioned about the incident by a supervisor.

"Officer Phan was found to have been less than truthful with several other supervisors during his probationary review period, the circumstances of which were documented in the previous Interim Probationary Employee Performance Evaluation.

"Human Relations: Officer Phan demonstrated poor interpersonal skills by displaying a discourteous attitude and an unprofessional demeanor when dealing with a supervisor.

"Officer Phan previously demonstrated a poor attitude and an unprofessional demeanor when dealing with supervisors, the circumstances of which were documented in the previous Interim Probationary Employee Performance Evaluation."

[14] The referee also noted that Kessler "had previously been disciplined for making discriminatory and/or racist remarks. In the past, other officers filed complaints about disparaging statements . . . Kessler made. . . . Kessler had to attend sensitivity training as a result of the past complaints and was suspended for ten days. . . . Kessler's history supports the argument that [the city's] reasons for terminating [Phan] were grounded in

discriminatory animus and that [Phan's] poor performance was pretextual." With regard to the prior complaints, the record reflects that an anonymous complaint of racism against Kessler was made on April 4, 2011. Following an investigation, the Internal Affairs Division determined that this complaint should be closed as unfounded. The other complaints concern Kessler's conduct on September 25 and October 2, 2012, and May 7, 2013, after Phan had been terminated from his position as a probationary police officer.

[15] The trial court also remanded the matter to the commission to issue a new order regarding damages because the referee's original order was more than four years old. Despite this remand, the trial court's decision on the merits of the city's appeal was an appealable final judgment. See General Statutes § 4-183 (j); *Commission on Human Rights & Opportunities* v. *Board of Education*, 270 Conn. 665, 674–75, 855 A.2d 212 (2004).

[16] In *Jones* v. *Dept. of Children & Families*, supra, 172 Conn. App. 28–29, an employee claimed that, under the "cat's paw" theory of liability, the employer was responsible for intentional discrimination because its decision to terminate the employee's employment was tainted by the impermissible bias of his supervisor. This court held that the cat's paw theory of liability had not been satisfied because the final termination decision was made after an independent review of concrete, objective factors. Id., 31.

[17] In its brief, the commission tacitly acknowledges this error but states that the trial court's finding "is of little consequence given the substantial other evidence in the record linking Kessler to the decision to terminate Phan."

[18] We note that in *Gibilisco* v. *Tilcon Connecticut, Inc.*, 203 Conn. App. 845, 846–47, 251 A.3d 994, cert. denied, 336 Conn. 947, 251 A.3d 77 (2021), which was on appeal following the granting of a motion for summary judgment rather than following a trial, an employee asserted that his former employer wrongfully terminated his employment because he had filed for workers' compensation benefits. After the trial court granted summary judgment in favor of the employer, the employee appealed and argued, in part, that the close temporal proximity of approximately two weeks between his final work injury and the employer's decision to terminate his employment was, on its own, enough to satisfy his minimal burden of raising a genuine issue of material fact regarding setting forth a prima facie case. Id., 861–62. In response, the employer contended that temporal proximity does not, on its own, give rise to an inference of discrimination where no other evidence is offered to support a claim of retaliation. Id., 862–63. Because the employee in *Gibilisco* had produced evidence of a close temporal proximity between the exercise of his rights and the employer's adverse action, as well as additional evidence sufficient to raise a disputed issue of fact as to whether the employer's adverse action took place under circumstances permitting an inference of discrimination, we reversed the judgment of the trial court and did not need to address the merits of the employer's contention. Id., 863 n.15.

[19] Kessler prepared daily observation reports for Phan on March 24, March 25, March 26, May 16, May 17, May 23 and May 25, 2011. In the report dated March 25, 2011, Kessler gave Phan an unsatisfactory rating for his adherence to policies and procedures. In the report dated March 26, 2011, Kessler gave Phan an unsatisfactory rating in the performance of patrol, investigative or assigned tasks. We note that Kessler's signature does not appear on the bottom of the March 25, 2011 report included in the record; Kessler, however, testified that he gave the unsatisfactory rating in that report.

[20] The referee stated that "[e]xhibits illustrate the changes in [Phan's] performance evaluations, and testimony from the public hearing about the camaraderie and socializing of . . . Kessler with other sergeants demonstrate that . . . Kessler's discriminatory animosity towards [Phan] motivated or influenced other officers to complain about [Phan's] performance."

[21] Marinelli testified:

"Q. And you said you were promoted to a sergeant about four years ago, correct?

"A. Yes, November of 2010.

"Q. And that was around the same time as Sergeant Kessler and Sergeant Cicero?

"A. Yes, we were all promoted together.

"Q. The same time, so you guys are kind of colleagues, classmates?

"A. Okay.

"Q. Do you socialize outside of work?

"A. Every once in a while, very—you know, I don't go out much with officers after work. I kind of keep to myself.

"Q. Okay but for the sergeants that—you know, you kind of got promoted together, you kind of—are you kind of in a—was there a comradery between getting promoted?

"A. In our group?

"Q. Yeah.

"A. Not really.

"Q. You're like, you know, a class of sergeants or—

"A. Well, we're that group that got promoted at the same time, but—you know, it's not like we go to dinner once a week or anything like that."

[22] Cicero testified:

"Q. Did you and Sergeant Kessler graduate from the academy at the same time?

"A. No, we were not classmates.

"Q. You're not classmates, are you friends?

"A. We're coworkers.

"Q. Okay, were you promoted to sergeant at the same time?

"A. Yes, we were.

"Q. Do you socialize outside of work together?

"A. I do not, no ma'am."

[23] Rousseau testified that any time an issued item is lost or stolen there must be an investigation. When asked about the delay between when Phan lost his hat piece on July 19, 2010, and the investigation into the matter in February, 2011, Rousseau testified:

"Q. Okay, but it looks like Officer Phan lost his hat back in July and he reported it to them in August—

"A. Correct.

"Q. —based on this. So shouldn't that—this investigation have been done back in July and August?

"A. You know, I'm confident that [it] would have been done back in July and August—you know, I think a lot of the blame needs to be on his shoulders because he [misled] supervisors in the department throughout. And, you know, there was an assumption that an investigation was going, there was an assumption that he had found his hat piece and the case was closed.

"So yeah, it probably should have been done way back when he lost it. Unfortunately, you know, he took measures and steps to deceive a lot of people and if he hadn't taken those steps and measures the investigation, I'm confident, would have been done way back then. It wasn't brought to my attention until February when the sergeant was doing inspection at roll call and he noticed he had a spare hat piece. And if I had known about it within those months it took place, I would have conducted the investigation myself. Unfortunately, I wasn't notified, I was under the assumption that he'd found his hat and hat piece."

[24] In light of this conclusion, it is unnecessary to address the city's remaining claim that the court improperly held that the commission correctly had applied the law on remand.

———————————————